REICHHOLD CHEMICALS, INC., Plaintiff-Appellant/Appellee v. ANIL B. GOEL, Defendant-Appellant/Appellee

No. COA00-459

(Filed 18 September 2001)

**1. Appeal and Error— contention raised in appellee's brief— properly heard in oral argument—reply brief struck**

The Court of Appeals granted defendant's motion to strike plaintiff's reply brief where defendant's brief raised no new contention that did not arise naturally and logically from the record and questions presented, and oral arguments were heard. Oral arguments were the proper place for plaintiff's contention. N.C. R. App. P. 28(h)(1) and (2).

**2. Appeal and Error— record amended—improperly pled defense—argued in trial court by consent**

The Court of Appeals granted plaintiff's motion to amend the record on appeal where the amendment supported the argument that an affirmative defense was raised by express or implied consent even though it was not properly pled.

**3. Wrongful Interference— lawsuit—objectively reasonable**

Plaintiff could still be liable for tortious interference with defendant's consulting contract with another company (Imperial) even if plaintiff's suit against Imperial was objectively reasonable. There is no relation between tortious interference and the legislative intent behind federal antitrust law.

**4. Wrongful Interference— legal malice—findings—anticompetitive purpose**

The trial court properly concluded that plaintiff acted with legal malice in addition to actual malice in bringing a suit against another company where the court found that the suit was brought solely for anti-competitive purposes. A good faith belief that

REICHHOLD CHEMS., INC. v. GOEL

[146 N.C. App. 137 (2001)]

trade secrets were misappropriated in no way necessitates the conclusion that the suit was brought without legally malicious intent.

**5. Wrongful Interference— counterclaim to trade secrets suit—liability for anti-competitive purposes**

A plaintiff was liable on a counterclaim for tortious interference for its anti-competitive purposes in bringing a trade secrets lawsuit rather than simply for bringing the lawsuit.

**6. Wrongful Interference— business relationship—knowledge of relationship**

A plaintiff was not shielded from liability on a counterclaim for tortious interference with a consulting agreement by the fact that it may not have known of the consulting agreement. Plaintiff's knowledge of the business relationship satisfies the knowledge requirement of tortious interference.

**7. Wrongful Interference— trade secret suits—liability for tortious interference—no lawful reason for suit**

A trade secret owner will not be liable for tortious interference in a suit legitimately brought to protect his legal rights; liability for tortious interference will only lie where such suit is brought with no sufficient lawful reason.

**8. Wrongful Interference— trade secrets—FBI statements**

The trial court did not err in a tortious interference counterclaim by finding that the FBI did not state that trade secret theft had occurred. Although plaintiff (defendant in the counterclaim) argues that the trial court erred by considering incompetent and irrelevant evidence from the FBI investigation, the court gave weight to what the FBI did not say rather than to what it said.

**9. Damages and Remedies— future profits—conservative business estimate**

The trial court did not err in a tortious interference counterclaim by awarding compensatory damages for future royalty payments where the product pro forma used by the trial court was a conservative business projection of a planned product line prepared well before trial and approved by a publicly held parent company. While it may be difficult to calculate and prove future profits for a new business, North Carolina has not adopted a per se rule against the award of such damages.

**10. Employer and Employee— non-compete agreement— Illinois law—narrowly construed**

The trial court did not err in its interpretation of a non-compete agreement under Illinois law where defendant and plaintiff-corporation signed a non-compete agreement when defendant went to work with plaintiff as the vice president of research and development for plaintiff's Swift Adhesives division; defendant was subsequently moved to the automotive adhesives division as a sales and marketing manager in a demotion; and the trial court held that defendant had not breached the agreement because the company for which defendant began working (Imperial) had no intention of competing with plaintiff's automotive adhesives business.

**11. Employer and Employee— non-compete agreement—finding concerning defendant's activities—supported by evidence**

The trial court did not err when construing a non-compete agreement by finding that plaintiff was not involved in research and development activities (which were covered by the agreement) where defendant was transferred from research and development to marketing and sales of automotive adhesives and was involved in the development of new adhesives only in the limited capacity of seeing that the needs of particular automotive customers were met.

**12. Employer and Employee— non-compete agreement—publicly known information**

The trial court did not err in an action on a non-compete agreement by holding that plaintiff failed to meet its burden of proving that defendant breached the confidentiality provision of the agreement where there was no evidence that defendant and the company for which he was going to consult discussed anything more than publicly known product lines and customers.

**13. Fiduciary Relationship— workplace—managerial position**

The trial court did not err by finding that defendant did not breach a fiduciary duty owed to plaintiff in an action on a non-compete agreement. A fiduciary relationship will generally not be found in the workplace and a managerial position alone does not demonstrate the domination and influence required to create a fiduciary obligation.

**14. Trade Secrets— information commonly known**

The trial court's conclusion that plaintiff's information was not a trade secret was supported by competent evidence that the information was commonly known.

**15. Employer and Employee—vacation and bonus pay**

The trial court did not err in an action arising from a non-compete agreement by awarding vacation and bonus pay to defendant or by doubling that award for lack of good faith.

**16. Unfair Trade Practices— filing lawsuit—objectively reasonable—federal antitrust reasoning**

The trial court did not err by granting summary judgment for plaintiff on defendant's counterclaim for unfair trade practices arising from a non-compete agreement and a lawsuit filed against another company (Imperial) with whom defendant had a consulting agreement where the suit was for no legitimate purpose but was objectively reasonable. Chapter 75 of the North Carolina General Statutes was modeled after federal antitrust law and the reasoning of *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, and *Professional Real Estate Investors v. Columbia Pictures Industries*, 508 U.S. 49, apply to N.C.G.S. § 75-1.1. Moreover, there was no indication that plaintiff's activities preceding the filing of its suit (including filing a complaint with the FBI) were undertaken for any trade purpose other than preparation for the suit.

**17. Employer and Employee— salaried executive—time spent elsewhere—company reimbursed**

The trial court did not err in an action against an employee who was consulting with another company by awarding plaintiff a reimbursement for salary paid to defendant while defendant was visiting that company. Although defendant argued that he was a salaried executive who was entitled to adjust his schedule to meet his own needs, plaintiff's executives have a limited number of vacation days and plaintiff should be compensated for days defendant did not spend working for plaintiff insofar as defendant was compensated for vacation days not taken.

**18. Trade Secrets–attorney fees— misappropriation**

The trial court did not err by denying attorney fees under N.C.G.S. § 66-154(d) for bringing a trade secret misappropriation claim in bad faith where the court found that the plaintiff

**REICHHOLD CHEMS., INC. v. GOEL**

[146 N.C. App. 137 (2001)]

acted with legal malice in its final judgment. The fact that a suit was brought with malicious intent does not exclude the possibility of a good faith belief that the suit has a legitimate basis.

Appeal by plaintiff from orders entered 3 August 1999 by Judge Abraham Penn Jones in Superior Court, Wake County. Appeal by defendant from orders entered 9 September 1998 and 3 August 1999 by Judge B. Craig Ellis and Judge Abraham Penn Jones, respectively, in Superior Court, Wake County. Heard in the Court of Appeals 14 March 2001.

*Maupin Taylor & Ellis, P.A., by M. Keith Kapp, Mark S. Thomas, Kevin W. Benedict and Joanne Lambert, for plaintiff-appellant/appellee.*

*McConwell Law Offices, by Edward A. McConwell; and, Grafstein & Walczyk, P.L.L.C., by Lisa Grafstein, for defendant-appellant/appellee.*

McGEE, Judge.

Reichhold Chemicals, Inc. (plaintiff) filed a complaint against Anil B. Goel (defendant) on 5 February 1997 and amended the complaint on 1 August 1997. The amended complaint states claims of misappropriation of trade secrets, breach of express confidentiality agreement, breach of fiduciary duty, breach of employment agreement, misapplication of plaintiff's money, fraud, and two claims of constructive fraud. Defendant filed counterclaims of tortious interference, defamation per se, employment compensation and expenses, and unfair and deceptive trade practices.

The trial court granted plaintiff's motion for summary judgment on defendant's counterclaim of unfair and deceptive trade practices on 9 September 1998. Following a bench trial, the trial court entered an order on 3 August 1999 denying plaintiff's claims of trade secret misappropriation, breach of express confidentiality agreement, breach of fiduciary duty, breach of employment agreement, and the first claim of constructive fraud. The trial court granted plaintiff's claims of misapplication of plaintiff's money, fraud, and the second claim of constructive fraud. The trial court granted defendant's counterclaims of tortious interference and employment compensation but denied defendant's claim of defamation.

REICHHOLD CHEMS., INC. v. GOEL

[146 N.C. App. 137 (2001)]

Plaintiff appeals from the trial court's 3 August 1999 orders. Defendant appeals both the 9 September 1998 order and the 3 August 1999 orders.

The trial court found the following facts in its 3 August 1999 order. Defendant began working for Swift Adhesives, Inc. (Swift), a division of plaintiff, in February 1990. Defendant, a recognized expert in the field of moisture cured polyurethane adhesives, was hired by Swift as vice president of research and development because of his knowledge of reactive urethanes and their manufacture. Defendant and Swift specifically negotiated a non-compete agreement which would permit defendant to compete in the reactive adhesives market after leaving Swift.

In 1994, plaintiff eliminated defendant's position as vice president of research and development for Swift and moved defendant to plaintiff's automotive adhesives unit. From November 1994, defendant was not involved in research and development activities for plaintiff. Plaintiff's president did not consider plaintiff's automotive adhesives unit to be a viable business unit. Defendant's reassignment was a demotion and an attempt by plaintiff's president to induce defendant to leave.

Defendant, recognizing the reassignment as a demotion, decided to leave plaintiff once he found an opportunity to work in the field of polyurethane reactive adhesives. Beginning no later than November 1994, defendant had discussions with Imperial Adhesives, Inc. (Imperial) about defendant's possible employment for the purpose of developing moisture cured polyurethane reactive adhesives for Imperial. At some point after March 1995, Imperial decided it could not afford to hire defendant as an employee, and Imperial and defendant discussed the possibility of a consulting agreement.

Defendant signed a consulting agreement with Imperial in March 1996 which was not to go into effect until defendant left plaintiff's employ. Both defendant and Imperial intended to begin the consulting relationship in January 1997. Defendant began teaching Imperial employees about the formulation and manufacture of polyurethane reactive adhesives in the spring of 1996. Imperial's legal counsel advised defendant that defendant's discussions with Imperial did not violate defendant's non-compete agreement with Swift. Defendant and Imperial specifically agreed that there would be no transfer of confidential or trade secret information, and defend-

ant insisted that Imperial not target any of plaintiff's customers in marketing the products they were contemplating.

The consulting agreement provided that defendant was to work for 203 days over four years at a fixed rate of pay. The agreement further provided for defendant to receive royalties on any products he developed for Imperial for fifteen years. Imperial compiled a product pro forma, conservatively forecasting the first five years of its entry into the hot melt moisture cured urethane segment of the adhesive industry, for presentation to Imperial's publicly held parent company. Five or six accountants sitting on the board of Imperial's parent company reviewed and approved the product pro forma. The hot melt adhesives covered by the product pro forma were not the only reactive urethane adhesives contemplated in the consulting agreement. Based solely on the minimum days of consulting and the product pro forma, the trial court concluded that defendant had a reasonable expectation of earning $2,493,585.00 under the consulting agreement.

Between November 1995 and October 1996, defendant made at least sixteen trips to Imperial. At no time did defendant inform plaintiff of his consulting agreement with Imperial. Defendant spent at least fourteen days primarily engaged in meetings with Imperial while on plaintiff's payroll, a value of not less than $6,440.00, and submitted $7,500.00 in expense reimbursements for those trips. However, during the time he was meeting with Imperial, defendant continued his work with plaintiff and met or exceeded his projected goals for the automotive adhesives unit.

A secretary at Imperial contacted plaintiff in September 1996 and indicated that she believed defendant was engaged in improper conduct. The secretary provided confidential Imperial documents to plaintiff for review, none of which contained information proprietary to plaintiff. Through the secretary's attorneys, plaintiff made a report of trade secret theft to the Federal Bureau of Investigation (FBI). The FBI interviewed both defendant and Imperial's president on 30 October 1996 and indicated to plaintiff at that time that the allegations of trade secret theft were not substantiated. Nonetheless, plaintiff's president had defendant escorted from the building, telling defendant that defendant's reputation would be ruined, that defendant would not get another job in the adhesives industry, and that Imperial would never get into the reactive urethane adhesives business.

Plaintiff filed a complaint against Imperial on 30 October 1996, alleging that defendant had misappropriated plaintiff's trade secrets and other confidential and proprietary information. Imperial abandoned its consulting agreement with defendant, feeling intimidated, threatened and embarrassed by the allegations made by plaintiff, a much larger company than Imperial. Plaintiff sought to coerce defendant into cooperating in its suit against Imperial by threatening to sue defendant, then sued defendant anyway despite his cooperation. Plaintiff's costs in obtaining the testimony of the Imperial secretary and internal Imperial documents far exceeded its potential loss from the alleged trade secret theft.

The trial court found that, at the time he was terminated, defendant had seventeen days of vacation accrued in 1996 and was entitled to ten days of accrued vacation carried over from 1995 under plaintiff's policy of allowing vacation days to be carried over with supervisor approval. In addition, plaintiff had a written policy entitling defendant to a prorated bonus paid at separation unless the separation was a voluntary quit or discharge for cause, and defendant's was neither. The trial court concluded that defendant was entitled to those payments, and that defendant was entitled to have those payments doubled because of plaintiff's failure to demonstrate that they were withheld in good faith.

The trial court also found, in connection with plaintiff's trade secret misappropriation claim, that in late 1995, a chemist working for plaintiff developed a liquid moisture cured urethane adhesive formula labeled "2U026-1N" after a customer requested a modified version of plaintiff's formula 22005. The chemist had never developed a moisture cured urethane adhesive formula before. Plaintiff's 2U026-1N had three ingredients: two Dow polyols, in a two-to-one ratio, with one Dow solid isocyanate.

An Imperial chemist developed a moisture cured urethane adhesive designated UL9001 in the summer of 1996. Imperial's UL9001 had two Olin polyols and a Dow liquid isocyanate, plus a catalyst, none of which were used in plaintiff's formula. The use of polyols in a two-to-one ratio in urethanes had been discussed in urethane literature as early as 1961 and was commonly known and used in the industry. The Imperial chemist's lab notes indicated that he considered several ratios of polyol to polyol and polyol to isocyanate before arriving at the formulation for UL9001.

The trial court found that Imperial's UL9001 was materially different from plaintiff's 2U026-1N in formulation, manufacture and functionality. The two were not the same formula, and each could be easily derived from information provided by raw material suppliers such as Dow and Olin. Imperial's UL9001 was independently developed, and Imperial was not aware of plaintiff's 2U026-1N until its litigation with plaintiff. Defendant, a recognized expert in the field of reactive moisture cured urethane adhesives, would have no reason to misappropriate a formula developed by a novice in the field.

Moreover, plaintiff's 2U026-1N was developed for a single customer and failed to meet that customer's needs. Plaintiff had no sales or prospect of sales since the formula was developed and plaintiff had made no effort to market it until the present litigation was well underway. The trial court concluded that plaintiff's 2U026-1N had no actual or potential commercial value.

The trial court further found that information about the design and operation of a manufacturing facility similar to the information defendant provided to Imperial was widely known and previously published in a 1990 brochure. The trial court found that defendant had sufficient information prior to 1990 about the manufacture of moisture cured urethane adhesives to provide information on the process to Imperial. Also based on knowledge acquired prior to 1990, defendant provided plaintiff with the information necessary to create the manufacturing process at its facility.

I.

.Plaintiff first assigns error to the trial court's conclusion that plaintiff tortiously interfered with the consulting agreement between defendant and Imperial.

> The tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 674, 84 S.E.2d 176, 181-82 (1954)).

A.

Plaintiff first asserts that it acted with justification in bringing suit against Imperial. Plaintiff presents several arguments supporting its defense of justification.

1.

First, plaintiff encourages this Court to apply the reasoning of *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 5 L. Ed. 2d 464 (1961), as applied in *Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 123 L. Ed. 2d 611 (1993) (*PRE*), to the present case. Under *Noerr* and *PRE*, the filing of a lawsuit with anti-competitive intent does not violate the federal antitrust statutes if the lawsuit is "objectively reasonable." *See PRE* at 57, 123 L. Ed. 2d at 621. Plaintiff argues that, under that reasoning, plaintiff is shielded from liability for tortious interference as long as its suit against Imperial was objectively reasonable, regardless of plaintiff's subjective intent.

Defendant, in his appellee brief before this Court, asserts that plaintiff failed to plead immunity under *Noerr* as an affirmative defense and therefore that plaintiff was prohibited from arguing the applicability of *Noerr* on appeal. Plaintiff responded by filing a reply brief and a motion to amend the record on appeal in support of plaintiff's contention that it had properly pleaded *Noerr* before the trial court. Defendant filed a motion to strike plaintiff's reply brief and opposed plaintiff's motion to amend the record on appeal.

[1] We first address defendant's motion to strike plaintiff's reply brief. Plaintiff asserts that it filed its reply brief under N.C.R. App. P. 28(h)(1), which provides that, "[i]f the appellee has presented in its brief new or additional questions as permitted by Rule 28(c), an appellant may, within 14 days after service of such brief, file and serve a reply brief limited to those new or additional questions." N.C.R. App. P. 28(c) provides that,

> Without having taken appeal, an appellee may present for review, by stating them in his brief, any questions raised by cross-assignments of error under Rule 10(d). Without having taken appeal or made cross-assignments of error, an appellee may present the question, by statement and argument in his brief, whether a new trial should be granted to the appellee rather than a judgment n.o.v. awarded to the appellant when the latter relief is sought on appeal by the appellant.

Defendant did not raise any cross-assignments of error under N.C.R. App. P. 10(d), and plaintiff does not seek judgment n.o.v. on appeal.

In *Newsome v. N.C. State Bd. of Elections*, 105 N.C. App. 499, 415 S.E.2d 201 (1992), our Court permitted a reply brief where

> appellants, in their reply brief, responded to two new issues raised in the briefs by defendants-appellees and intervening defendants-appellees. These issues concerned whether the appeal was moot and whether the plaintiffs lacked equity. Although appellees claim that they have adopted verbatim the question presented by appellants, the matters they argue in their brief do not arise naturally and logically from the record and question presented.

*Id.* at 504, 415 S.E.2d at 204. Plaintiff argues that defendant's contention on appeal that plaintiff had failed to plead *Noerr* was similarly a new issue that did not "arise naturally and logically from the record and question presented." We disagree. Once defendant raised the question of whether *Noerr* was properly pleaded, plaintiff was entitled to argue that *Noerr* was properly pleaded during oral arguments or, if there were no oral arguments, in a reply brief under N.C.R. App. P. 28(h)(2). Because oral arguments were heard, that was the proper place for plaintiff to challenge defendant's contention that *Noerr* had not been properly pleaded. We therefore grant defendant's motion to strike plaintiff's reply brief.

[2] We next address plaintiff's motion to amend the record on appeal. Plaintiff moves to amend the record to include: (1) plaintiff's brief in support of partial summary judgment on defendant's claim of unfair and deceptive trade practices; (2) defendant's brief in opposition to partial summary judgment; and (3) plaintiff's trial brief. N.C.R. App. P. 9(b)(5) provides that, "[o]n motion of any party or on its own initiative, the appellate court may order additional portions of a trial court record or transcript sent up and added to the record on appeal." Plaintiff argues that its proposed amendment supports plaintiff's contention that *Noerr* was properly pleaded before the trial court and explains the material's absence from the record on appeal as due to plaintiff's failure to anticipate defendant's contention to the contrary. We have held that, "while the failure to plead an affirmative defense ordinarily results in a waiver of the defense, the issue may still be raised by express or implied consent." *Miller v. Talton*, 112 N.C. App.

484, 487, 435 S.E.2d 793, 796 (1993). Plaintiff's proposed amendment supports plaintiff's contention that *Noerr* was argued before the trial court by the consent of both parties. We therefore grant plaintiff's motion to amend the record on appeal.

**[3]** However, without addressing whether *Noerr* was properly pleaded and thus is properly before us on appeal, we decline to apply the reasoning of *Noerr* to defendant's claim of tortious interference. The U.S. Supreme Court based its decision in *Noerr* both on the First Amendment right to petition and on a statutory interpretation of federal antitrust law. *Noerr*, 365 U.S. at 137-38, 5 L. Ed. 2d at 471. In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 30 L. Ed. 2d 642, 646 (1972), the U.S. Supreme Court indicated that the right to petition, and therefore the reasoning of *Noerr*, extended to the filing of a lawsuit. However, in *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 76 L. Ed. 2d 277 (1983), the U.S. Supreme Court held that, while the right to petition entitled a plaintiff to file an objectively reasonable lawsuit despite malicious intent, *see id.* at 743, 76 L. Ed. 2d at 289, the bringing of such a lawsuit with malicious intent could be penalized as an unfair labor practice after the suit had concluded. *See id.* at 747, 76 L. Ed. 2d at 291-92. It follows that, because the present case does not seek to interfere with plaintiff's suit against Imperial, plaintiff's right to petition is not implicated.

Plaintiff therefore relies solely on the U.S. Supreme Court's statutory interpretation of federal antitrust law for its contention that, given an objectively reasonable lawsuit, it should not be liable for the state tort of tortious interference. Because we see no relation between the tort of tortious interference and the legislative intent behind federal antitrust law, we decline to attempt to conform the reasoning of *Noerr* to the present case. We therefore hold that, even if plaintiff's suit against Imperial was objectively reasonable, plaintiff could still be liable for tortious interference. *Cf.* Section VIII, *infra*.

2.

Plaintiff next argues that the trial court erred in its interpretation of the law of tortious interference in North Carolina, insofar as the trial court concluded that plaintiff could be held liable for tortious interference through the malicious filing of a lawsuit, regardless of the objective reasonableness of the lawsuit.

Our Supreme Court has stated that "legal malice" demonstrates a lack of justification in an action for tortious interference and has distinguished "legal malice" from "actual malice":

> There are frequent expressions in judicial opinions to the effect that malice is requisite to liability in an action for inducing a breach of contract. . . . The term "malice" is used in this connection in its legal sense, and denotes the intentional doing of the harmful act without legal justification. Indeed, actual malice and freedom from liability for this tort may coexist. If the outsider has a sufficient lawful reason for inducing the breach of contract, he is exempt from liability for so doing, no matter how malicious in actuality his conduct may be. . . . For this reason, actual malice is ordinarily material in an action for inducing a breach of contract only on the issue of whether punitive damages should be awarded. Notwithstanding it is not an element of the cause of action, actual malice may negative the existence of justification in a particular case. This is true because the outsider is never justified in inducing a breach of contract solely for the purpose of visiting his personal hatred, ill will, or spite upon the plaintiff.

*Childress*, 240 N.C. at 675, 84 S.E.2d at 182 (citations omitted). *See also, Robinson, Bradshaw, & Hinson v. Smith*, 129 N.C. App. 305, 318, 498 S.E.2d 841, 851 (1998). Thus, plaintiff was justified in bringing suit against Imperial only if plaintiff acted with sufficient lawful reason.

> "The privilege [to interfere with a contractual relationship] is conditional or qualified; that is, it is lost if exercised for a wrong purpose. In general, a wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved."

*Smith v. Ford Motor Co.*, 289 N.C. 71, 91, 221 S.E.2d 282, 294 (1976) (emphasis in original) (citation omitted). Moreover, a subjective belief that interference is permissible is insufficient to defeat a claim of tortious interference if legal malice is present. *See United Laboratories*, 322 N.C. at 663, 370 S.E.2d at 388 ("[W]e reject defendant's argument that a good faith belief that the covenants are unenforceable automatically justifies contractual interference.").

We conclude that a showing of legal malice will defeat plaintiff's defense of justification in filing suit against Imperial, and that insofar as legal malice relates to intent, the "objective reasonableness" of the

suit is irrelevant. We therefore find no error in the trial court's application of the law of tortious interference.

3.

**[4]** Plaintiff challenges the trial court's conclusion that plaintiff exhibited legal malice sufficient to defeat its defense of justification in interfering with the consulting agreement between defendant and Imperial. Plaintiff first asserts that the trial court found only actual malice, not legal malice, and therefore that, under *Childress*, plaintiff's defense of justification was not defeated. However, in addition to holding that plaintiff demonstrated actual malice sufficient to support a grant of punitive damages, the trial court held that plaintiff's suit against Imperial was brought solely for anti-competitive, and therefore not legitimate, purposes. The trial court thus found that plaintiff acted with legal malice.

Plaintiff also contends that the trial court's conclusion of legal malice is unsupported by its findings of fact, insofar as the trial court found that plaintiff's suit against Imperial "stated in good faith" that defendant had misappropriated plaintiff's trade secrets. However, a *good faith belief that trade secrets were misappropriated in no way necessitates that a suit alleging such misappropriation was brought without legally malicious intent. We conclude that the trial court's conclusion of legal malice, in the form of anti-competitive purpose, is well supported by its findings of fact.

4.

**[5]** Finally, plaintiff asserts that it was justified in bringing its suit against Imperial because, under N.C. Gen. Stat. § 66-152, it was required to file suit to protect its trade secret rights. However, had the trial court found that plaintiff brought its suit against Imperial to protect plaintiff's legal rights, the trial court would not have found that plaintiff acted with legal malice in bringing suit. Plaintiff is liable, not for bringing suit, but for plaintiff's anti-competitive purposes in bringing suit.

B.

**[6]** Plaintiff's next challenge to defendant's claim of tortious interference in the present case is that plaintiff cannot be held to have tortiously interfered with the consulting agreement between defendant and Imperial because it had no actual knowledge of the agreement. *See United Laboratories*, 322 N.C. at 661, 370 S.E.2d at 387. However,

while the trial court made no specific finding that plaintiff knew of the consulting agreement before filing suit, plaintiff does not challenge the trial court's finding that plaintiff knew of the business relationship between defendant and Imperial.

> The outsider has knowledge of the contract within the meaning of the second element of the tort if he knows the facts which give rise to the plaintiff's contractual right against the third person. "If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means something other than what it is judicially held to mean."

*Childress*, 240 N.C. at 674, 84 S.E.2d at 182 (citation omitted). We conclude that, insofar as plaintiff sought to disrupt the relationship between defendant and Imperial, plaintiff's knowledge of that relationship satisfies the knowledge requirement of tortious interference. Inducing a person not to enter into a contract is as much a tort as interference with an established contract. *See Equipment Co. v. Equipment Co.*, 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965). The fact that plaintiff may not have known, at the time it filed suit against Imperial, that defendant had already signed the consulting agreement with Imperial cannot shield plaintiff from liability.

## C.

[7] Plaintiff asserts that adoption by this Court of the trial court's reasoning on defendant's claim of tortious interference will have a "chilling" effect on future efforts by trade secret owners to protect against misappropriation. Plaintiff suggests that unless this Court adopts the reasoning of *Noerr* and prohibits liability for tortious interference in any objectively reasonable lawsuit, owners of trade secrets will hesitate in acting to protect their interests for fear of such liability. We disagree. Under the reasoning of the trial court, as adopted by this Court, a trade secret owner will not be liable for tortious interference in a suit legitimately brought to protect its legal rights. Liability for tortious interference will only lie where such a suit is brought with *no* sufficient lawful reason.

## D.

[8] Finally, plaintiff asserts that the trial court erred in considering evidence of the FBI investigation of defendant's and Imperial's activities in finding tortious interference. Plaintiff argues that the FBI investigators' statements to plaintiff that there was no protectable

trade secret interest in the information that plaintiff claimed was a trade secret was incompetent and irrelevant evidence as to the basis of plaintiff's suit against Imperial, both because the criminal standard of proof differs from the civil standard and because the FBI investigators were not trained experts in the field of chemistry.

However, the trial court's conclusion was that plaintiff "knew or should have known, prior to filing suit against Imperial, that it had *insufficient information to determine* whether Imperial or [defendant] were misappropriating its trade secrets" (emphasis added). Thus the FBI investigators' statements did not act to support an inference of no protectable trade secret interest, but instead *failed* to support an inference that there *was* a protectable trade secret interest. The trial court did not give any weight to what the FBI investigators said; instead, it merely noted what they did not say. We conclude that, insofar as a statement by the FBI that trade secret theft had occurred might have acted to justify plaintiff's suit against Imperial, the trial court did not err in finding as fact that the FBI made no such statement.

## II.

**[9]** Plaintiff next assigns error to the trial court's award of compensatory and punitive damages to defendant on defendant's claim of tortious interference. Plaintiff asserts that the trial court erred in awarding compensatory damages for future royalty payments on a line of products never created based solely on the projections of Imperial's product pro forma. Plaintiff argues that defendant failed to meet its burden in proving those damages, insofar as "the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 547-48, 356 S.E.2d 578, 586 (1987) (citation omitted).

However, while it may be difficult to calculate and prove future profits for a new business, North Carolina has declined to adopt a *per se* rule against the award of such damages. *See id.* at 546, 356 S.E.2d at 585. The product pro forma used by the trial court in the present case was prepared well before trial as a conservative business projection of one planned line of products and was approved by Imperial's publicly held parent company. Moreover, defendant is a recognized expert in the field of developing and manufacturing such products. We conclude that the trial court did not err in holding that

the product pro forma's conservative revenue projections produced a reasonably certain estimate of defendant's damages.

Plaintiff challenges the punitive damages awarded to defendant solely on the grounds of plaintiff's contention that the trial court improperly found plaintiff liable for tortious interference. Because we have upheld plaintiff's liability for tortious interference, we find no error in the trial court's award to defendant of punitive damages on that claim.

### III.

Plaintiff assigns error to the trial court's holding that defendant did not breach the terms of the non-compete agreement defendant signed with Swift. The trial court held, and the parties do not challenge, that the agreement is governed by the law of Illinois.

### A.

[10] Plaintiff first challenges the trial court's interpretation under Illinois law of the first paragraph of the non-competition section of the non-compete agreement:

> Employee agrees that, while employed by the Company, Employee will undertake no planning for or organization of any business activity competitive with the work Employee performs, or with the business Employee works in, as an employee of the Company.

The trial court held that, given the Illinois courts' position that "private covenants restraining trade are disfavored in the law and will be carefully scrutinized to ensure that they are reasonable and not contrary to public policy[,]" *Peterson-Jorwic Group v. Pecora*, 586 N.E.2d 676, 677 (Ill. App. Ct. 1st Dist. 1991) (citation omitted), the above paragraph should be read to encompass only defendant's work as a sales and marketing manager for plaintiff's automotive adhesives unit. The trial court concluded that, because Imperial had no intention of competing with plaintiff's automotive adhesives business, defendant did not breach his non-compete agreement.

Plaintiff argues that the paragraph should not be construed so narrowly. However, we note that the non-compete agreement was drafted by defendant's employer, and ambiguities in written instruments are to be strictly construed against the drafting party. *See Camp v. Leonard*, 133 N.C. App. 554, 562, 515 S.E.2d 909, 914 (1999). Moreover, insofar as defendant signed the non-compete agreement

with Swift and then moved to the automotive adhesives unit of Swift's much larger parent company, it could be unreasonable to extend the meaning of the agreement to cover the entirety of the parent company. We hold that, because the language of the paragraph specifically limits its application to the business the employee performs, not the employer as a whole, the trial court did not err in applying the non-compete agreement under Illinois law.

[11] Plaintiff also argues that defendant was in fact involved in developing hot-melt adhesive products for plaintiff's automotive adhesives business, and therefore that the trial court erred in concluding that defendant was not involved in research and development activities for plaintiff. However, defendant's responsibilities were the marketing and sales of automobile adhesives, and defendant was involved in the development of new adhesives only in the limited capacity of seeing that the needs of particular automotive customers were met. We hold that the trial court's finding that defendant was not involved in research and development activities is supported by competent evidence.

The trial court further held that, insofar as the non-compete agreement permitted defendant to compete with plaintiff in the field of polyurethane reactive adhesives after leaving plaintiff's employ, and insofar as defendant's meetings with Imperial were not competition but merely preparatory to the activation of the consulting agreement, plaintiff had no legitimate business interest in interfering with defendant's efforts to work for Imperial. There is no indication that the trial court believed the non-compete agreement explicitly allowed defendant to compete with plaintiff while employed for plaintiff, despite plaintiff's contention to the contrary.

B.

[12] Plaintiff next challenges the trial court's conclusion that defendant did not violate the confidentiality provision of the non-compete agreement. In particular, plaintiff suggests that, insofar as defendant and Imperial agreed that Imperial would not target any of plaintiff's customers, defendant must have disclosed to Imperial information about plaintiff's product lines and who plaintiff's customers were. However, the confidentiality provision does not apply to information in the public domain, and there is no evidence to suggest that defendant and Imperial discussed anything more than those product lines and customers of plaintiff's that were publicly known. The trial court's holding that plaintiff failed to meet its burden in proving

**REICHHOLD CHEMS., INC. v. GOEL**

[146 N.C. App. 137 (2001)]

defendant breached the confidentiality provision of the non-compete agreement is supported by the trial court's findings of fact and by competent evidence.

## IV.

**[13]** Plaintiff assigns error to the trial court's failure to determine that defendant breached a fiduciary duty owed to plaintiff. However, our Supreme Court has recently indicated that a fiduciary relationship will generally not be found in the workplace. *See Dalton v. Camp*, 353 N.C. 647, 548 S.E.2d 704 (2001). A managerial position alone does not demonstrate the requisite " 'domination and influence on the other' " required to create a fiduciary obligation. *Id.* at 652, 548 S.E.2d at 708 (citation omitted). We conclude that defendant owed no fiduciary duty to plaintiff, and therefore that the trial court did not err in finding no breach of such a duty.

## V.

**[14]** Plaintiff next assigns error to the trial court's determination that plaintiff's formula 2U026-1N and information about its manufacturing process were not trade secrets under North Carolina law. *See* N.C.G.S. § 66-152(3). In particular, plaintiff argues that the trial court's conclusion that information about the composition and manufacture of plaintiff's 2U026-1N was commonly known and used in the industry is unsupported by the industry publications submitted by defendant to the trial court. However, plaintiff does not contest that defendant's witnesses testified that the information was commonly known. We hold that the trial court's conclusion that plaintiff's information was not a trade secret is supported by competent evidence, and thus find no error in the trial court's conclusion that defendant did not misappropriate plaintiff's trade secrets.

## VI.

**[15]** Plaintiff assigns error to the trial court's award to defendant of vacation and bonus pay after defendant left plaintiff's employ, as well as the doubling of that award for lack of good faith. Although plaintiff asserts on appeal that it acted in good faith in withholding payments from defendant, we find the trial court's conclusion to the contrary to be supported by its uncontested findings of fact.

Plaintiff asserts that, while vacation days can be carried over from one year to the next with supervisor approval, the trial court made no express finding of fact that such supervisor approval was

received. However, the parties stipulated before trial that defendant had received the required authorization. Plaintiff also asserts that defendant is not entitled to a prorated bonus because he resigned voluntarily. However, we hold that the trial court's finding that defendant did not resign voluntarily is supported by competent evidence. We therefore find no error in the trial court's awards of vacation and bonus pay to defendant.

## VII.

Finally, plaintiff assigns error to the trial court's failure to consider plaintiff's claims of fraud and constructive fraud in connection with expense reimbursements submitted to plaintiff for trips to visit Imperial. However, those claims were considered and addressed together with plaintiff's claim for misapplication of plaintiff's money. We therefore hold that the trial court did not fail to consider plaintiff's fraud and constructive fraud claims.

## VIII.

**[16]** In his first assignment of error, defendant asserts that the trial court erred in granting summary judgment on defendant's claim of unfair and deceptive trade practices. Defendant argues that plaintiff's tortious interference with the consulting agreement between defendant and Imperial constitutes an unfair trade practice under N.C. Gen. Stat. § 75-1.1. *See, e.g., McDonald v. Scarboro*, 91 N.C. App. 13, 370 S.E.2d 680 (1988). Defendant further contends that, under *Sara Lee Corp. v. Carter*, 351 NC 27, 34, 519 S.E.2d 308, 312 (1999), the employment relationship between plaintiff and defendant does not protect plaintiff from liability for unfair and deceptive trade practices.

Plaintiff argues that a reasonably objective lawsuit can never be an unfair trade practice, under the reasoning of *Noerr* and *PRE*. *See* Section I.A.1, *supra*. *Noerr* was based on a statutory interpretation of federal antitrust law. *See Noerr*, 365 U.S. at 137-38, 5 L. Ed. 2d at 471. This Court has noted that Chapter 75 of the North Carolina General Statutes was modeled after that federal antitrust law, and that federal decisions may "provide guidance in determining the scope and meaning of chapter 75." *DKH Corp. v. Rankin-Patterson Oil Co.*, 131 N.C. App. 126, 128-29, 506 S.E.2d 256, 258 (1998) (citations omitted). We therefore hold that the reasoning of *Noerr* and *PRE* apply to N.C.G.S. § 75-1.1. We note that both plaintiff and defendant argued *Noerr* in their briefs supporting and opposing plaintiff's motion for summary judgment of defendant's trade secret claim.

Under *PRE*, a plaintiff may not be held liable under federal antitrust law for bringing an objectively reasonable lawsuit, regardless of the plaintiff's subjective intent in bringing the suit. *See PRE*, 508 U.S. at 57, 123 L. Ed. 2d at 621. A lawsuit is objectively reasonable if "an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome[.]" *Id.* at 60, 123 L. Ed. 2d at 624. We agree with the trial court's conclusion in the present case that, though filed for no legitimate purpose, plaintiff's trade secret suit against Imperial was not utterly baseless. *See* Section I.A.3, *supra*. We therefore hold that plaintiff's suit against Imperial was objectively reasonable, and thus that the suit did not constitute an unfair trade practice under N.C.G.S. § 75-1.1.

Defendant suggests that plaintiff's activities preceding the filing of its suit against Imperial, including acquiring confidential Imperial documents and filing a complaint with the FBI, constitute an unfair trade practice independent of the suit against Imperial. However, there is no indication that plaintiff undertook those acts for any trade related purpose other than preparation for the suit against Imperial. We hold that those actions alone are insufficient to qualify as unfair trade practices under N.C.G.S. § 75-1.1.

We therefore find no error in the trial court's order granting plaintiff summary judgment on defendant's unfair and deceptive trade practices claim.

## IX.

[17] In his second assignment of error, defendant asserts that the trial court erred in awarding plaintiff a reimbursement for salary paid to defendant while defendant was visiting Imperial. Defendant asserts that, as a salaried executive, defendant was entitled to adjust his schedule to meet his personal needs. Defendant argues that, as long as he fulfilled his employment duties with plaintiff, he was entitled to his full salary. Plaintiff counters that even executives have a limited number of vacation days per year, and that defendant's freedom to be compensated while taking time away from his employment is limited. We agree with plaintiff that, insofar as defendant was compensated by plaintiff for vacation days not taken, plaintiff should be compensated for days defendant did not spend working for plaintiff. We also agree with plaintiff that plaintiff's pleadings and the statement of issues in the pre-trial order are broad enough to support plaintiff's recovery of those wages. We find no error in the trial court's award.

REICHHOLD CHEMS., INC. v. GOEL

[146 N.C. App. 137 (2001)]

## X.

[18] In his third and final assignment of error, defendant asserts that the trial court erred in failing to award attorneys' fees to defendant under N.C. Gen. Stat. § 66-154(d), which provides that, "[i]f a claim of misappropriation is made in bad faith or if willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party." In denying attorneys' fees to defendant under N.C.G.S. § 66-154(d), the trial court found, in a separate 3 August 1999 order, that plaintiff did not bring its trade secret misappropriation claim against defendant in bad faith. However, the trial court also stated in the separate order denying attorneys' fees that, in the event of an inconsistency between the findings in that order and the findings in what the trial court referred to as its final judgment, the findings in the final judgment would prevail. Defendant argues that the trial court's findings that plaintiff acted with legal malice are inconsistent with a finding that plaintiff did not bring its trade misappropriation claim in bad faith.

However, as discussed in Section I.A.3, *supra*, the fact that a suit was brought with malicious intent does not exclude the possibility of a good faith belief that the suit has legitimate basis. *See also, United Laboratories*, 322 N.C. at 663, 370 S.E.2d at 388. We conclude that the findings of the trial court's final judgment are not inconsistent with the trial court's finding that plaintiff did not bring its trade misappropriation claim against defendant in bad faith.

In summary, we affirm the trial court's orders.

Affirmed.

Judges WYNN and THOMAS concur.