RCJJ, LLC v. RCWIL Enters., LLC, 2017 NCBC 24.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 3392

RCJJ, LLC; DO GOOD REAL ESTATE, LLC; DO GOOD REAL ESTATE OF WILMINGTON, LLC; and JOHNATHAN JACKSON,

          Plaintiffs,

v.

RCWIL ENTERPRISES, LLC d/b/a Nest Realty Wilmington, and RYAN CRECELIUS,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**OPINION AND ORDER ON PLAINTIFFS' MOTION FOR JNOV AND A NEW TRIAL AND DEFENDANTS' MOTION FOR ATTORNEYS' FEES**

THIS MATTER comes before the Court upon (1) Plaintiffs' Motion for Judgment Notwithstanding the Verdict and for New Trial on Damages, or in the Alternative for a New Trial ("Plaintiffs' JNOV Motion") and (2) Defendants' Motion for Attorneys' Fees ("Motion for Fees") (collectively, the "Motions").

THE COURT, having considered the Motions, the briefs in support of and in opposition to the Motions, the supporting documents filed by the parties, the evidence presented at trial, and other matters of record, concludes, in its discretion, that Plaintiffs' JNOV Motion should be DENIED, and Defendants' Motion for Fees should be DENIED.

*Shipman & Wright, LLP, by W. Cory Reiss, Esq. for Plaintiffs.*

*Murchison, Taylor & Gibson, PLLC, by Michael Murchison, Esq., and Hodges, Coxe, Potter & Phillips, LLP, by Samuel B. Potter, Esq., for Defendants.*

McGuire, Judge.

*A. Procedural Background.*

1.   On September 23, 2014, Plaintiffs initiated this action by filing a Complaint in the Superior Court for New Hanover County. On October 20, 2014, Plaintiffs filed their Amended Complaint and on October 24, 2014, Defendants filed a Notice of Designation seeking assignment of this action to the North Carolina Business Court. On October 24, 2014, the Chief Justice of the Supreme Court of North Carolina designated this case to the North Carolina Business Court pursuant to N.C. Gen. Stat. § 7A-45.4 (hereinafter, references to the North Carolina General Statutes will be to "G.S.") and on October 27, 2014, the case was assigned to the undersigned.

2.   On March 30, 2015, the Court issued a Preliminary Injunction Order prohibiting Defendants from disclosing or using Plaintiffs' alleged trade secrets and confidential information for any purpose related to conducting Defendants' business.

3.   On September 4, 2015, Plaintiffs filed their Second Amended Complaint. The Second Amended Complaint contained the following claims: (a) tortious interference with contract, (b) misappropriation of trade secrets in violation of G.S. § 66-152 *et seq.*, (c) fraud, (d) fraud in the inducement, (e) punitive damages, (f) unfair and deceptive trade practices, (g) breach of contract, (h) breach of fiduciary duties, (i) constructive fraud, (j) injunctive relief, (k) conversion, (l) unjust enrichment in the alternative, and (m) rescission in the alternative.

4.   On October 6, 2015, Defendants filed their Answer to Second Amended Complaint, Motion to Dismiss, and Counterclaim ("Answer"). In the Answer, Ryan Crecelius ("Crecelius") raised a counterclaim against Plaintiffs for breach of contract.

5. On June 20, 2016, the Court issued an Opinion and Order on Motion for Summary Judgment dismissing Plaintiffs' claims for tortious interference with contract, unfair and deceptive trade practices, conversion and unjust enrichment, and dismissing, in part, Plaintiffs' claims for fraud, constructive fraud and breach of fiduciary duty arising from Defendants' alleged misappropriation of trade secrets and confidential information.

6. From October 31 through November 10, 2016, the Court conducted a jury trial on Plaintiffs' remaining claims for fraud, breach of fiduciary duty, constructive fraud, misappropriation of trade secrets, breach of contract, rescission, and punitive damages, and Crecelius's counterclaim for breach of contract. At the close of Plaintiffs' case-in-chief the Court directed a verdict for Defendants on the claim for rescission. Plaintiffs did not move, pursuant to North Carolina Rule of Civil Procedure 50 ("Rule(s)"), for a directed verdict on their claims at the close of Defendants' evidence or at the close of all the evidence.

7. On November 10, 2016, the jury returned a verdict in favor of Plaintiffs on their claim for breach of contract and awarded them one dollar ($1.00) in damages. The jury returned verdicts in favor of Defendants on Plaintiffs claims for fraud, breach of fiduciary duty, constructive fraud, and misappropriation of trade secrets. The jury returned a verdict in favor of Plaintiffs on Crecelius's counterclaim for breach of contract.

8. On November 21, 2016, the Court entered a Final Judgment on the jury's verdict and all remaining claims in the case, and dissolved the preliminary

injunction issued on March 30, 2015. The Court held open the questions of taxation of costs and an award of attorneys' fees for further application by the parties.

9. On November 21, 2016, Defendants filed their Motion for Fees, along with affidavits of counsel and a supporting memorandum. On November 28, 2016, Plaintiffs filed a memorandum in opposition to the Motion for Fees. Defendants did not reply. The Motion for Fees is now ripe for determination.

10. On November 28, 2016, Plaintiffs filed Plaintiffs' JNOV Motion and a supporting memorandum. On December 1, 2016, Defendants filed an opposition to Plaintiffs' JNOV Motion, and on December 12, 2016, Plaintiffs filed a reply. Plaintiffs' JNOV Motion is now ripe for determination.

*B. The Evidence at Trial.*

11. Plaintiffs and Defendants presented testimonial and documentary evidence during trial.

12. The evidence at trial showed that Crecelius formed Do Good Real Estate, a real estate brokerage firm, in 2010. Do Good Real Estate operated in the Wilmington, North Carolina area.

13. In May 2012, Johnathan Jackson ("Jackson") invested $25,000 for a 50% equity interest in Crecelius's real estate business. As part of the investment agreement, Jackson and Crecelius organized RCJJ, LLC ("RCJJ"), in which Jackson and Crecelius each held a 50% interest. Jackson and Crecelius also formed Do Good Real Estate, LLC, in which RCJJ was the sole member, and Do Good Real Estate Wilmington, LLC, in which Do Good Real Estate, LLC, was the sole member

(hereinafter, RCJJ Holdings, LLC; Do Good Real Estate, LLC; and Do Good Real Estate Wilmington, LLC, collectively, will be referred to as "Do Good"). Jackson was Do Good's Chief Financial Officer, and Crecelius its Chief Executive Officer and broker-in-charge ("BIC") with responsibility for the company's sales and day-to-day operations.

14. Between May 2012 and August 2014, Jackson and Crecelius grew Do Good to include 13 agents[1] while significantly increasing the company's revenue.

15. Do Good maintained a database called Highrise containing information on potential customers and sales leads compiled from various public and private sources. Highrise was also supplemented with information entered by Jackson and the agents. Jackson testified that he considered the information compiled in Highrise to be proprietary and highly confidential, and a valuable resource to Do Good. Crecelius and various former Do Good agents testified that they did not consider Highrise confidential or a valuable sales resource.

16. Defendants presented evidence that in the summer of 2014, Jackson's behavior led to a deterioration of his relationship with Crecelius and the agents.[2] On July 20, 2014, Crecelius and Jackson began discussing separating their interests in Do Good. From July 20 through August 25, 2014, the parties negotiated the separation of their interests in Do Good.

---

[1] The agents were independent contractors, and not employees of Do Good.
[2] Jackson denied that he engaged in some of the conduct to which Crecelius and former Do Good Agents testified.

17.     On August 25, 2014, Jackson, in his individual capacity and on behalf of Do Good, and Crecelius executed a Separation Agreement and General Release ("Separation Agreement"). The terms of the Separation Agreement required Jackson to pay Crecelius $25,000.00 for his interest in Do Good, and for Do Good and Jackson to release Crecelius from certain non-competition and non-solicitation covenants. The Separation Agreement also required Crecelius to return to Jackson certain Do Good property in Crecelius's possession and transfer to Jackson access to Do Good's "online systems and accounts" including Highrise and other databases.

18.     On August 23, 2014, unbeknownst to Jackson, Crecelius downloaded a copy of Highrise to his personal computer's hard drive. Crecelius testified that he downloaded Highrise to comply with the North Carolina Real Estate Commission's ("Commission") record retention requirements. Plaintiffs disputed that the Commission's rules required Crecelius to retain the information contained in Highrise.

19.     On August 25, 2014, shortly after executing the Separation Agreement, Jackson discovered Crecelius had downloaded Highrise on August 23. Jackson and Crecelius subsequently negotiated, through their attorneys, for Crecelius to return Highrise to Jackson and Do Good. During this negotiation, Crecelius made clear to Jackson that he had not accessed Highrise. Ultimately, Crecelius returned Highrise to Jackson in the form of a flash drive, but advised Jackson that the database remained available on his hard drive through an archiving program. Plaintiffs

presented no evidence that Crecelius used any information from Highrise after August 25, 2014.

20. While negotiating with Jackson, Crecelius created a new real estate firm for which he would work after he separated from Do Good. The evidence showed that on August 21, 2014, Crecelius filed Articles of Organization for RCWIL, LLC ("RCWIL"). On August 21, 2014, Crecelius applied for a real estate license for RCWIL, and on August 28, 2014, the Commission issued a real estate license to RCWIL. RCWIL, doing business as Nest Realty Wilmington ("Nest"), began operations on August 29, 2014.

21. The evidence established that, while Jackson and Crecelius were negotiating the Separation Agreement, Do Good's agents communicated regularly with Crecelius. In these communications, the agents expressed their respective desires to join Crecelius if he established a new real estate firm. The agents also testified that they would not continue with Do Good if Jackson purchased Crecelius's interest in the company. Crecelius admitted that he advised the agents not to signal to Jackson their intentions to leave Do Good. Jackson claimed he did not realize all of Do Good's agents intended to leave if he purchased Crecelius's interest in Do Good.

22. Shortly after Jackson purchased Crecelius's interest in Do Good, all of Do Good's agents except for one terminated employment with Do Good and went to work for Crecelius at Nest. There was no evidence that Crecelius solicited any of the agents to leave Do Good or work for Nest.

23. Do Good unsuccessfully tried to retain a new BIC and hire new agents to replace the departed agents. The evidence established that Do Good's gross revenues declined after August 25, 2014.

*C. Analysis.*

### a. Plaintiffs' JNOV Motion.

i. <u>Motion for Judgment Notwithstanding the Verdict</u>.

24. Rule 50(b) provides, in relevant part, as follows:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the submission of the action to the jury shall be deemed to be subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict . . . .

G.S. § 1A-1, Rule 50.

25. In order to move for judgment notwithstanding the verdict, Plaintiffs were required first to have moved for a directed verdict at the close of all of the evidence. *Tatum v. Tatum*, 318 N.C. 407, 408, 348 S.E.2d 813, 813 (1986) ("Plaintiff failed to move for a directed verdict at the close of all the evidence. Therefore, plaintiff failed to preserve her right to move for judgment notwithstanding the verdict."); *Graves v. Walston*, 302 N.C. 332, 338, 275 S.E.2d 485, 489 (1981) ("In the present case, plaintiffs did not move for directed verdict at the close of plaintiffs' evidence or at the close of all the evidence. Plaintiffs thus had no standing after the verdict to move for judgment notwithstanding the verdict and for that reason the trial court

was without authority to enter judgment notwithstanding the verdict for plaintiffs.").

Plaintiffs did not move for a directed verdict at the close of the evidence. Accordingly,

Plaintiffs' motion for judgment notwithstanding the verdict should be DENIED.

ii. <u>Motion for New Trial</u>.

26. Plaintiffs move the Court alternatively pursuant to Rule 59(a) to order

either: (1) a new trial on the issue of damages; or (2) a new trial in the alternative.

Rule 59(a) provides, in pertinent part, as follows:

> (a) Grounds. – A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes or grounds:
>
> (1) Any irregularity by which any party was prevented from having a fair trial;
> (2) Misconduct of the jury or prevailing party;
> (3) Accident or surprise which ordinary prudence could not have guarded against;
> (4) Newly discovered evidence material for the party making the motion which he could not, with reasonable diligence, have discovered and produced at the trial;
> (5) Manifest disregard by the jury of the instructions of the court;
> (6) Excessive or inadequate damages appearing to have been given under the influence of passion or prejudice;
> (7) Insufficiency of the evidence to justify the verdict or that the verdict is contrary to law;
> (8) Error in law occurring at the trial and objected to by the party making the motion, or
> (9) Any other reason heretofore recognized as grounds for new trial.

G.S. § 1A-1, Rule 59. A motion for a new trial is committed to the sound discretion of

the Court. *Worthington v. Bynum*, 305 N.C. 478, 482, 290 S.E.2d 599, 602 (1982).

27.    Plaintiffs do not specify any particular subsection of Rule 59 under which they seek a new trial.[3] In support of their motion for a new trial, however, Plaintiffs contend:

> [T]the jury was permitted to hear testimony by agents that they disliked Mr. Jackson and would not have remained at Do Good regardless of Mr. Crecelius's plans to form RCWIL Enterprises, LLC/Nest, to which the Plaintiffs objected as reflected in their First Motion in Limine, which is incorporated herein by reference. The verdict is contrary to law, inadequate damages were given under the influence of passion or prejudice, and the submission of evidence objected to was error in law (*sic*).

(Pls.' Mem. Supp. Mot. JNOV 10.)

28.    As a preliminary matter, Plaintiffs attempt to incorporate by reference the same argument they made in their First Motion in Limine, that the agents' testimonies were improper and prejudicial, in support of their motion for a new trial. "[A] Rule 59 motion 'cannot be used as a means to reargue matters already argued . . .' at the trial court level." *Sellers v. Ochs*, 180 N.C. App. 332, 335, 638 S.E.2d 1, 3 (2006) (citing *Smith v. Johnson*, 125 N.C. App. 603, 606, 481 S.E.2d 415, 417 (1997)). Plaintiffs' argument was previously rejected by this Court, and will not be reconsidered here.

29.    Plaintiffs' contention that a new trial on damages is warranted because "inadequate damages were given under the influence of passion or prejudice" caused by the testimony of the former Do Good agents is specious. The only claim upon which

---

[3] In their Memorandum in Support, Plaintiffs devote only two paragraphs, and less than one page, to their argument in support of the motion for new trial. (Pls.' Mem. Supp. Mot. JNOV 10 – 11.)

the jury awarded Plaintiffs damages was their claim for breach of contract. The jury, however, could not have considered the testimony of the former Do Good agents in awarding damages for breach of contract because the Court instructed the jury that Plaintiffs had not produced evidence of actual damages resulting from the breach, and that they were limited to awarding Plaintiffs nominal damages of one dollar ($1.00) if they found for Plaintiffs on the breach of contract claim.[4] By its verdict, the jury simply complied with the Court's instruction as to damages recoverable by Plaintiffs on this claim. The testimony of the former Do Good agents clearly had no impact on the award of damages. The Court, in its discretion, concludes that Plaintiffs' motion for a new trial on damages should be DENIED.

30.     To the extent Plaintiffs move for a new trial on all claims on the grounds that in reaching its verdict in favor of Defendants, the jury was unfairly influenced by the testimony of the former Do Good agents[5], Plaintiffs have made no argument in support of this contention.  As noted above, if Plaintiffs simply contend that the Court erred in its ruling on Plaintiffs' motion in limine seeking exclusion of the testimony, that argument is not properly considered on a motion under Rule 59. In addition, as the Court concluded in denying Plaintiffs' First Motion in Limine, the agents' testimonies about their personal feelings towards Mr. Jackson and their employment plans if Jackson purchased Do Good was relevant to the issues in the trial. The agents' testimonies regarding their working relationships with Jackson was

---

[4] In moving for a new trial, Plaintiffs do not contend and make no argument that any of the Court's instructions to the jury were erroneous.

[5] The Court notes that it did not permit the former-agent witnesses to testify regarding claims that they felt harassed or physically threatened by Jackson.

directly relevant to Plaintiffs' contention that he enjoyed a good relationship with the agents and the reasonableness of Jackson's expectation that they would continue to work for him after he bought Crecelius's interest in Do Good. The testimonies also provided relevant background information regarding the reasons that Jackson and Crecelius were separating their interests in Do Good. As such, the agents' testimonies were properly admitted.

31. The Court, in its discretion, concludes that Plaintiffs' alternative motion for a new trial should be DENIED.

### b. Defendants' Motion for Fees.

32. Defendants seek an award of attorneys' fees pursuant to G.S. §§ 6-21(12) and 66-154(d). G.S. § 6-21(12) provides that the Court may, in its discretion, award costs in actions for misappropriation of trade secrets, including reasonable attorneys' fees. G.S. § 66-154(d) provides that "[i]f a claim of misappropriation is made in bad faith . . . the court may award reasonable attorneys' fees to the prevailing party." *See Bruning & Federle Mfg. Co. v. Mills*, 185 N.C. App. 153, 157, 647 S.E.2d 672, 675 *cert. denied*, 362 N.C. 86, 655 S.E.2d 837 (2007). ("[A] trial court may only award attorneys' fees to the prevailing party '[i]f a claim of misappropriation is made in bad faith . . . pursuant to G.S. § 66-154(d).'").

33. Defendants prevailed on Plaintiffs' claim for misappropriation of trade secrets. Accordingly, the Court must determine whether Plaintiffs brought the claim in bad faith. Although North Carolina appellate courts have not written extensively on "bad faith" under G.S. § 66-154(d), "the North Carolina Court of Appeals has stated

succinctly that a finding of bad faith does not follow simply because a claimant proceeded with legal malice so long as the claimant had a good faith belief that the suit had legitimate basis." *Velocity Solutions, Inc. v. BSG, LLC*, 2015 NCBC LEXIS 54, at \*21 (N.C. Super. Ct. May 2015) (quoting *Reichhold Chems. Inc. v. Goel*, 146 N.C. App. 137, 158, 555 S.E.2d 281, 294 (2001). *See McKee v. James*, 2015 NCBC LEXIS 78, at \*22 (N.C. Super. Ct. 2015) (noting there is no indication that our appellate courts require a determination of *subjective bad faith* in reviewing claims for attorneys' fees under G.S. § 66-154(d) (emphasis added)).

34. Defendants cite several reasons why Plaintiffs' misappropriation of trade secrets claim was commenced and prosecuted in bad faith including, *inter alia*: Plaintiffs' refusal to accept Defendants' offer to enter into a consent permanent injunction "as the case approached trial"; Plaintiffs' inflated belief as to Highrise's actual value; and, Plaintiffs' "downplay[ing]" of the fact that the agents' own sales leads entered into the Highrise database did not belong to Do Good and were not proprietary.

35. Review of the record, including the evidence presented at trial, leads the Court to the conclusion that Plaintiffs had a good faith belief that their trade secrets misappropriation claim had a legitimate basis. First, the Court notes that Plaintiffs' claim for misappropriation of Highrise survived Defendants' Motion for Summary Judgment and was the basis of the Court's Order on Motion for Preliminary Injunction. While these facts are not dispositive of the issue of Plaintiffs' bad faith, they support Plaintiffs' contention that their claim had a legitimate basis.

36.     Second, Defendants' grounds for contending that Plaintiffs pursued the misappropriation claim in bad faith amount to little more than post-hoc challenges to the quality of Plaintiffs' litigation positions. Defendants' argument that Plaintiffs could, or should, have taken a different approach to pursuing their claim for misappropriation of trade secrets does not establish that Plaintiffs made the claim in bad faith.

37.     The Court concludes, in its discretion, that Plaintiffs' claim of misappropriation of trade secrets was not made in bad faith, and that Defendants should not be awarded attorneys' fees pursuant G.S. §§ 6-21(12) and 66-154(d). Defendants' Motion for Fees should be DENIED.

THEREFORE, IT IS ORDERED that:

1. Plaintiffs' JNOV Motion is DENIED as to both the request for judgment notwithstanding the verdict and the motion for a new trial.

2. Defendants' Motion for Fees is DENIED.

This the 16th day of March, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
For Complex Business Case