Outdoor Lighting Prospectives Franchising, Inc. v. Harders, 2012 NCBC 26.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 4430

| | | |
|---|---|---|
| OUTDOOR LIGHTING PERSPECTIVES FRANCHISING, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **ORDER ON MOTION FOR PRELIMINARY INJUNCTION** |
| PATRICK HARDERS, OUTDOOR LIGHTING PERSPECTIVES OF NORTHERN VIRGINIA, INC. and ENLIGHTENED LIGHTING, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

{1} THIS MATTER, designated a complex business case by Order of Chief Justice Sarah Parker dated March 28, 2012 and assigned to this court on March 30, 2012, is now before the court on Plaintiff Outdoor Lighting Perspectives Franchising, Inc.'s Motion for Preliminary Injunction ("Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, the Motion is GRANTED in part and DENIED in part.

*Parker Poe Adams & Bernstein, LLP, by William L. Essler IV and Katie M. Iams and Gray, Plant, Mooty, Mooty & Bennett, P.A., by Michael R. Gray,* pro hac vice, *for Plaintiff Outdoor Lighting Perspectives Franchising, Inc.*

*Hagan Davis Mangum Barrett & Langley, PLLC, by Beth D. Langley and Jason B. Buckland for Defendants Patrick Harders, Outdoor Lighting Perspectives of Northern Virginia, Inc., and Enlightened Lighting, LLC.*

Gale, Judge.

# I. SUMMARY OF HOLDING

{2} Plaintiff Outdoor Lighting Perspectives Franchising, Inc. ("OLP") seeks to enforce covenants to which it contends Defendants Patrick Harders ("Harders") and two corporations he controls, Outdoor Lighting Perspectives of Northern Virginia, Inc. ("OLP-NV") and Enlightened Lighting, LLC ("Enlightened"), are bound by reason of the October 23, 2006 agreement identified as Outdoor Lighting Perspectives Franchise Agreement ("Agreement"). OLP seeks a preliminary injunction *pendente lite.*

{3} OLP began the litigation by requesting that the court enjoin Defendants from any involvement in an "outdoor lighting business." At the hearing upon OLP's Motion, in response to the court's expressed concern whether the Agreement supports such a broad restriction, OLP indicated that it would be satisfied with a restriction limited to the scope of outdoor lighting business actually performed by Defendant Harders during the term of the Agreement. Defendants, on the other hand, urge that the ambiguity and breadth of the Agreement's language precludes any injunctive relief, particularly where the Agreement seeks to reach any outdoor lighting business in its broadest context and well beyond the contours of business Harders conducted pursuant to the Agreement while it was in force.

{4} While OLP champions its legal interests in protecting its franchise enterprise and invokes broad equitable principles to do so, ultimately, the court must apply the specific language OLP has chosen for that protection. And here, the court finds that the chosen language on the one hand is narrower than OLP's invitation to restrict Defendants from a wide field of outdoor lighting, and on the other hand broader than with which the North Carolina courts have been comfortable, at least in the employment field. Admittedly, North Carolina courts are more lenient in enforcing restrictions contained in agreements attendant to the sale of a business. Here, the case involves neither employment nor the sale of a business. It arises in the context of an expired franchise agreement. A franchisor more frequently pursues post-termination enforcement in federal court because of a former franchisee's abuse of federally protected trademark rights. In fact, OLP has

recently secured injunctive relief of that nature from Judge Mullen of the United States District Court for the Western District of North Carolina. *See Outdoor Lighting Perspectives Franchising, Inc. v. Home Amenities, Inc.*, No. 3:11-cv-0567, 2012 U.S. Dist. LEXIS 5406 (W.D.N.C. 2012). Here, however, OLP does not complain of trademark violations but of Defendants' failure to abide by covenants restricting competition as defined under the Agreement, as well as other obligations such as the return of confidential information, including customer records.

{5} Clearly, however, the primary focus of this action is to enforce the restriction on post-termination competition. The court's analysis then must contend with the precise language of the restrictive covenant, and the defined terms embodied in the covenant. Section 14.2(b) of the Agreement contains the post-termination non-compete provision and provides:

> Upon termination or expiration . . . transfer, sale or assignment of this Agreement by the Franchisee, neither the Franchisee, the operating manager or the Franchisee's owners will have any direct or indirect interest (i.e. through a relative) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent, for two (2) years, in any Competitive Business within 100 miles of the Territory or any other franchisee's Franchisor's or Affiliates territory.

(Compl. Ex. A ("Agrmt.") § 14.2(b).) The Agreement includes a "Definitions" section, but the term "Competitive Business" is not defined there. The term "Competitive Business" is first referenced in Section 14.2(a) of the Agreement which restricts competition by the Franchisee while the Agreement is in force. The Franchisee is prohibited by Section 14.2(a) from activity "to be used or employed in any business operating in competition with an outdoor lighting business or any business similar to the Business ("Competitive Business") as carried on from time to time . . ." "Business" and "Outdoor Lighting Business" are defined in the Agreement's "Definitions" section, at least when the terms are capitalized. The Agreement defines these capitalized terms to "mean[ ] the business operations conducted or to be conducted by the Franchisee consisting of outdoor lighting design and automated lighting control equipment and installation services, using the Franchisor's System

and in association therewith the Marks." (Agrmt. at B-2–B-4.) "Franchisor's System" or "System" means the standards, systems, concepts, identifications, methods and procedures developed or used by the Franchisor . . . for the sales and marketing of the Franchisor's Products . . . and Services . . ." (Agrmt. at B-2–B-4.)

{6} There is tension between these definitions. The scope of "Business" or "Outdoor Lighting Business" is defined in reference to the operations conducted by the individual Franchisee, which may or may not be coextensive with the Franchisor's overall operations. The Franchisor's overall operations, however, define the scope of the "System," and such operations may be broader than those conducted by the individual Franchisee in its "Business." "Competitive Business" is much more broadly stated than "Business." "Competitive Business" extends to any business in competition with an outdoor lighting business or any business "similar to" the defined term "Business." "Competitive Business" then is broader than the franchise "System," "Products," and "Services."[1] The post-termination restriction is defined in reference to "Competitive Business." The breadth of that chosen term creates the problem Plaintiff now faces in seeking injunctive relief. Had Plaintiff limited the covenant to the defined term "Business," it would present much less of an issue and would conform to Plaintiff's request to limit the injunction to what Defendants did pursuant to the Agreement. But, the chosen term reaches beyond the outer limits of North Carolina court decisions upholding restrictive covenants and, as the court concludes, falls within those cases which prohibit unreasonable restrictions on competition. The court concludes the overbreadth cannot be cured by "blue penciling" as the court cannot substitute "Business" for "Competitive Business" without rewriting the Agreement.

---

[1] "Products" and "Services" are also defined terms. "Products" is "all supplies, materials, and equipment sold, prepared or otherwise dealt with in connection with and all services performed at or from the home or leased Premises or in connection with the Business and associated with the Marks." (Agrmt. at B-4.) "Services" is "all services sold, prepared or otherwise dealt with in connection with Business and all services performed at or from the premises or in connection with the Business." (Agrmt. at B-4.) The terms are defined with specific references to "Business" done by the Franchisee as opposed to the Franchisor's overall business to the extent it was greater.

{7} OLP itself notes problems inherent in the geographic scope of the restrictive covenant which, as worded, extends to anywhere within 100 miles of the Territory or any other franchisee's Franchisor's or Affiliates Territory. OLP has franchises in several states, as well as territories and foreign countries. OLP invites the court simply to strike the 100 mile territorial provision so as to restrict the covenant to only the borders of any franchise territory. Defendants contend that OLP has no authority to make this request. The invitation to strike the 100 mile limitation presents a more comfortable invitation for the court's use of the blue pencil doctrine because it is arguable a "separate and distinct" clause that can be disregarded.

{8} The North Carolina Supreme Court has suggested that blue penciling may be appropriate in certain instances to refuse to enforce a distinctly separable part of the covenant. *Welcome Wagon Int'l, Inc. v. Pender*, 255 N.C. 244, 248, 120 S.E.2d 739, 742 (1961). But blue penciling does not allow a court to otherwise revise or rewrite the agreement between the parties. *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989); *Hartman v. W.H. Odell and Associates, Inc.*, 117 N.C. App. 307, 317, 450 S.E.2d 912, 920 (1994).

{9} Again, the court notes that this particular case turns on the precise language of this particular franchise covenant. A North Carolina appellate court may later adopt a standard of general application to franchises that affords well-written competition restrictions in a franchise agreement the benefit of the more liberal standard afforded to agreements incidental to the sale of a business. *See, e.g., Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 158 S.E.2d 840 (1968). Certainly, there are policy considerations that would militate in favor of such a standard. But, the court here need not resolve those policy questions. Here, it is constrained by the language OLP has chosen which pushes beyond even the borders of a liberal standard because the covenant goes beyond business in which the Franchisee itself was involved and transcends the business the Plaintiff can legitimately protect.

{10} A franchise agreement is a contract. There are certain bedrock principles that inform a court's approach to contract enforcement.

> The controlling purpose of the court in construing a contract is to ascertain the intention of the parties as of the time the contract was made, and to do this consideration must be given to the purpose to be accomplished, the subject-matter of the contract, and the situation of the parties . . . When the language of a contract is clear and unambiguous, effect must be given to its terms, and the court, under the guise of constructions, cannot reject what the parties inserted or insert what the parties elected to omit. It is the province of the courts to construe and not to make contracts for the parties.

*Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962).

{11} However, there are other covenants beyond Section 14.2(b) which do not present similar problems of overbreadth and to which Defendants must be bound.


## II. FINDINGS OF FACT

{12} The court considered testimony by affidavit, documents attached to the pleadings, briefs, oral argument, and other supporting materials, and after such consideration makes the following FINDINGS OF FACT for the limited purpose of determining the Motion.

{13} Plaintiff OLP is a North Carolina corporation with its principal place of business in Richmond, Virginia. OLP's predecessor in interest was based in North Carolina until Outdoor Living Brands, Inc.'s 2008 acquisition of OLP. OLP distributes its "Products" and "Services" through its authorized franchises. OLP owns the federally registered name Outdoor Lighting Perspectives® and related marks represented in Registration Nos. 3,250,972 and 3,302,023 (the "Marks"). OLP currently has forty-two (42) franchises in the United States, Canada, Kuwait, and the Bahamas. (Aff. of Scott Zide ("Zide Aff.") ¶ 24.)

{14} Defendant Harders is a citizen and resident of Manassas, Virginia. Defendant OLP-NV is a Virginia corporation owned by Harders which operated as an authorized OLP franchise until late October 2011. Enlightened is a Virginia

limited liability company owned by Harders.  Each Defendant has appeared and consents to the court's jurisdiction.

{15}  OLP and Harders entered into the initial Agreement in 2001, which was renewed in 2006.  Among other provisions, the Agreement granted Harders an exclusive license to use OLP's Marks and "Business System" in the Northern Virginia territory encompassing Arlington, Fairfax, Prince William, and Loudoun Counties.  (Compl. ¶¶ 4, 8; Aff. of Patrick Harders ("Harders Aff.") ¶¶ 4, 5.)  The Agreement expired on October 23, 2011.  Plaintiff contends that Harders consciously allowed the Agreement to expire while Harders asserts that OLP breached and terminated the Agreement on October 20, 2011 when an unknown caller informed Harders' customer Russell A. Bantham that Harders "was no longer associated [with] OLP and that [OLP was] taking over the Northern Virginia location."  (Harders Aff. ¶ 29; Zide Aff. ¶ 14; Affidavit of Russell A. Bantham ("Bantham Aff.") ¶¶ 4–7.)

{16}  On October 27, 2011, OLP sent a letter to Harders confirming the expiration of the Agreement and reminding Harders of his post-termination obligations pursuant to Sections 14.2(b) and 17.9 of the Agreement.  (Compl. Ex. B.) The language of the restrictive covenant provided by Section 14.2(b) and related definitions are laid out above.

{17}  By Section 17.9, Harders agreed that "upon termination or expiration of [the] Agreement," he would:

> (a)  Immediately discontinue the use of all Marks . . . ;

> (b)  Immediately turn over to the Franchisor all materials, including the Manual, customer lists, records, files, instructions, brochures, advertising materials, agreements, Confidential Information, Trade Secrets and any and all other materials provided by the Franchisor to Franchisee . . .;

> (c) . . . take such action within five (5) days to cancel or assign to Franchisor or its designee as determined by Franchisor, all Franchisee's right, title and interest in and to Franchisee's telephone numbers . . .

(Agrmt. §§ 17.9(a)–(c).)

{18} OLP does not contend that Defendants have continued to use the Marks. It does complain, however, that Defendants have not turned over written materials as required by Section 17.9. Defendants have cancelled the telephone numbers used during the franchise term, but OLP complains that those numbers have not been assigned as the Agreement requires.

{19} OLP contends that it discovered in January 2012, through an article in Loudoun Magazine, that Harders was directly competing with OLP in the territory previously serviced by OLP-NV. (Compl. Ex. C.) The article identifies Harders as the owner of Enlightened and quotes him extensively regarding his outdoor lighting capabilities. (Compl. ¶ 17.) OLP believes that through Enlightened, Harders "is providing the same services to the same customers with the same assets, employees and Business Systems as when he was an OLP franchisee." (Pl.'s Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Pl.'s Supp. Br.") at 1.) OLP further alleges that Harders uses his OLP-NV projects to promote Enlightened, asserting that the Enlightened website (www.enlightenedlights.com) "displays several homes . . . that are actually lighting projects completed while [Harders] was operating as OLP-NV." (Pl.'s Supp. Br. at 3.) Defendants indicate that such references have now been removed from Enlightened's website. (Harders Aff. ¶72.)

{20} After discovering the article, OLP's counsel wrote Harders' counsel requesting his voluntary compliance with the post-expiration provisions of the Agreement and indicating that litigation would follow his refusal to do so. (Compl. Ex. D.) Harders refused, asserting that: (1) the post-termination non-compete provision of the Agreement is overly broad and unenforceable as a matter of law; (2) with the exception of certain documents retained for tax reasons, he no longer possesses any OLP competitively sensitive or proprietary information, and (3) neither he nor Enlightened continues to utilize the Marks in any way.

{21} On March 5, 2012, Plaintiff filed suit in Mecklenburg County Superior Court against Harders, Enlightened, and OLP-NV for breach of the post-expiration obligations of the Agreement, civil conspiracy, misappropriation of goodwill, and

injunctive relief pursuant to Rule 65, contending that the continued operation of Enlightened as a direct competitor in the outdoor lighting industry has irreparably harmed OLP and frustrated its ability to re-franchise the Northern Virginia territory previously serviced by OLP-NV.

{22} OLP had earlier instituted litigation in the United States District Court for the Western District of North Carolina against another franchisee and secured a preliminary injunction enjoining that franchisee from being engaged in "the outdoor lighting business." Unlike Harders, that franchisee apparently continued to use the Marks, and the federal court had jurisdiction under the trademark laws. *See Outdoor Lighting Perspectives Franchising, Inc.*, 2012 U.S. Dist. LEXIS 5406. The federal court did not in its memorandum opinion address the overbreadth issue that now precludes this court from enforcing the covenant it finds to be overbroad.

{23} OLP claims the right to eliminate geographic overbreadth by exercising a unilateral choice to strike the language providing a buffer of "within 100 miles" under Section 14.5 of the Agreement which provides that "the Franchisor reserves the right to reduce the scope of [Section 14.2] without the Franchisee's consent, at any time or times, effective immediately upon notice to the Franchisee." (Agrmt. § 14.5.) Defendants contend that if such language gave OLP the right to modify the scope of the Section 14.2(b) covenant while the Agreement was in force, such right expired upon the termination of the Agreement. The court need not resolve issues of geographic scope in light of its decision on other grounds.

### III. CONCLUSIONS OF LAW

{24} "A preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754 (1983). Issuance is proper only:

> (1) if the plaintiff is able to show a *likelihood* of success on the merits of his case and (2) if the plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of the litigation.

*Id.* (citations omitted) (emphasis in original). The burden is on the moving party to establish its right to a preliminary injunction, but the remedy "should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC 38 ¶ 29 (N.C. Super. Ct. Sept. 29, 2011), http://www.ncbusinesscourt.net/opinions/2011_NCBC_38%20.pdf (citations omitted); *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976).

{25} The Motion is to be determined pursuant to North Carolina law based on the Agreement's choice of law provision in Section 21.1.

{26} North Carolina law has developed a substantial body of case law addressing the enforceability of restrictive covenants both incident to contracts of employment and contracts for the sale of a business. The case law in the North Carolina state courts addressing post-termination obligations in franchise agreements is less defined.

{27} Under North Carolina law, covenants in restraint of trade are subject to careful judicial scrutiny. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 370 S.E.2d 375 (1988). The reasonableness of such restraints depends on the circumstances of each case and is a question of law for the court to decide. *Keith v. Day*, 81 N.C. App. 185, 193, 343 S.E.2d 562, 567 (1986) (citing *Jewel Box Stores Corp.*, 272 N.C. 659, 158 S.E.2d 840). "A covenant which prohibits a person from engaging in a similar business will be upheld if:" (1) it is founded on valuable consideration; (2) it is necessary to protect the legitimate interest of the one who is to benefit from the covenant; (3) it is reasonable with respect to time and territory; and (4) it does not interfere with the public interest. *Id.* (citations omitted). By statute, the covenant must be in writing and signed by the one who agrees not to compete. N.C. GEN. STAT. § 75-4 (2012).

{28} Covenants in employment agreements which restrain competition are not viewed favorably under modern law. *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 282, 530 S.E.2d 878, 881 (2000). Any ambiguity in a covenant against competition is to be construed against the drafter. *Reichhold Chems., Inc. v. Goel*,

146 N.C. App. 137, 153, 155, 555 S.E.2d 281, 291 (2001). A restrictive covenant "is unreasonable and void if it is greater than is required for the protection of the promisee or it imposes an undue hardship upon the person who is restricted." *Masterclean of N.C., Inc. v. Guy*, 82 N.C. App. 45, 50, 345 S.E.2d 692, 695 (1986) (citations omitted).

{29} However, North Carolina courts will enforce well-written restrictions on competition. "While the law frowns upon unreasonable restrictions, it favors the enforcement of contracts intended to protect legitimate interests. It is as much a matter of public concern to see that valid covenants are observed as it is to frustrate oppressive ones." *Kuykendall*, 322 N.C. at 649; 370 S.E.2d at 380 (internal quotations, brackets, and citations omitted).

{30} North Carolina courts recognize the distinction between covenants not to compete ancillary to the sale of a business and covenants not to compete ancillary to employment contracts, with the latter deserving closer judicial scrutiny. *See Seaboard Indus.,* Inc. v. Blair, 10 N.C. App. 323, 178 S.E.2d 781 (1971); *Jewel Box Stores Corp.*, 272 N.C. 659, 158 S.E.2d 840.

{31} The North Carolina Supreme Court articulated the principal justification for the heightened scrutiny applicable to restrictive covenants ancillary to employment contracts as follows:

> [a] workman "who has nothing but his labor to sell and is in urgent need of selling that" may readily accede to an unreasonable restriction at the time of his employment without taking proper thought of the morrow, but a professional man who is the product of a modern university or college education is supposed to have in his training an asset which should enable him adequately to guard his own interest, especially when dealing with an associate on equal terms.

*Beam v. Rutledge*, 217 N.C. 670, 673–74, 9 S.E. 2d 476, 478 (1940).

{32} The North Carolina Court of Appeals explained that the policy factors play differently in the sale of a business as follows:

> [a]mong reasons often given for the greater acceptability of "sale of business covenants" are that covenants not to compete enable the seller of a business to sell his goodwill and thereby receive a higher

> price; and they also furnish a material inducement to the purchaser
> who purchases a business with the hope of retaining its customers.

*Seaboard Indus., Inc.* 10 N.C. App. at 333, 178 S.E.2d at 787.

{33} A franchise agreement is generally entered into for purposes of enabling the franchisee to create a valued business by utilizing the franchisor's system and marks, with the successful franchisee creating goodwill for both the franchisor and franchisee. As such, a franchise agreement shares some of the same characteristics as a sale of a business. And, at least theoretically, the franchisee has more leverage and freedom of contract than might an employee in those situations typical of the employment contracts on which case precedent was created. But, even a more lenient standard attendant to the sale of a business does not authorize a court to enforce covenants more broadly than they were written and agreed to by the signatories.[2]

{34} The language of the restrictive covenant at issue here would clearly be problematic in an employment agreement, for North Carolina courts do not look favorably upon restrictions against "direct[ ] or indirect[ ]" competition in employment contracts. *See VisionAIR v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (affirming trial court's ruling that plaintiff-employer could not show a likelihood of success on the merits of a preliminary injunction when the non-compete provision stated the employee could not "own, manage, be employed or otherwise participate in, directly or indirectly, any business similar to the Employer's"). However, similar phrases have been enforced in an agreement ancillary to the sale of a business. *See Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 226, 333 S.E.2d 299, 303–04 (1985) (overturning summary judgment in favor of defendant-purchaser of business and upholding as valid covenant not to "*directly or*

---

[2] Through its papers and during oral argument, Plaintiff repeatedly encouraged the court to adopt and apply franchise standards developed by the federal courts. While it is true that some federal courts apply a quasi-intermediate level of scrutiny to franchise agreements, reported North Carolina appellate court decisions fail to make such a distinction. Furthermore, the unreported federal authority cited by Plaintiff fails to articulate a bright-line test to determine the enforceability of restrictive covenants incident to franchise agreements. *See Lockhart v. Home-Grown Indus. of Ga., Inc.,* No. 3:07-CV-297, 2007 U.S. Dist. LEXIS 67256 (W.D.N.C. 2007); *Meineke Car Care Centers, Inc. v. Bica*, No. 3:11-cv-369-FDW-DCK, 2011 U.S. Dist. LEXIS 118171 (W.D.N.C. 2011).

*indirectly* be employed by, be associated with, be under contract with, own, manage, operate, join, control or participate in the ownership, management, operation, or control of, or be connected in any manner with, any business which is a competitor . . .") (emphasis added). Here, the court determines that the use of the terms "direct or indirect interest (i.e., through a relative)" do not alone invalidate the covenant.

{35} The problem here arises because of the definition of "Competitive Business" in Section 14.2(a). The definition is by no means a model of clarity. The language, however, closely attempts to restrict Defendants from any "outdoor lighting business or any business similar to the Business . . ." If the word "business" were capitalized, the Agreement's own definition would restrict the scope to the activities actually conducted by Defendants pursuant to the Agreement. The language so limited would be consistent with OLP's indication at oral argument that an injunction of that scope would adequately protect its interests. However, the language further restricts Defendants from <u>any</u> outdoor lighting business and any business which competes with a business "similar to" the Franchisee's business. This expansive language extends well beyond activities that Defendants performed pursuant to the Agreement. It likewise extends beyond the business OLP itself conducts. The language thus extends beyond OLP's legitimate business interests.

{36} Even though contained in a franchise agreement, the breadth of the chosen language conflicts with cases which refuse, at least in the employment context, to enforce restrictive covenants which purport to limit the promisor's ability to perform work in an unrelated capacity for a business in the same field. *See Henley Paper Co. v. McAllister*, 253 N.C. 529, 534–35, 117 S.E.2d 431, 434 (1960) (non-compete which purported to "exclude[ ] defendant from too much territory and from too many activities" found overly broad and unenforceable), *VisionAIR*, 167 N.C. at 508–09, 606 S.E.2d at 362–63 (non-compete ancillary to employment agreement found overly broad and unenforceable where the defendant would "be prevented from doing even wholly unrelated work at any firm similar to [plaintiff]"); *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920 (non-compete ancillary to employment agreement found overly broad and unenforceable "in that, rather than

attempting to prevent plaintiff from competing for business, it required plaintiff to have no association whatsoever with any business that provides [similar] services. . . . Such a covenant would appear to prevent plaintiff from working as a custodian for any 'entity'" performing such services).

{37} This is not, however, an employment case. Cases might allow OLP to restrict Defendants from doing business after the franchise ends from business that they did while an OLP franchisee. Try as it might, the court cannot interpret the definition of a "Competitive Buisness" to be restricted to the business done by Defendants pursuant to the Agreement. The court should not and will not enforce the covenant to foreclose Harders or his corporations from the entire field of outdoor lighting or any business that competes with an outdoor lighting business or a "similar" business. That is the only choice the definition of "Competitive Business" gives the court. The court would have preferred to limit the definition to "Business" done by the franchisee. It would have enforced that covenant. But simply striking the term "Competitive" from the definition so as to substitute the defined term "Business" would require the court to rewrite the Agreement that the Parties entered into.[3]

{38} OLP has not shown a probability of success in enforcing the covenant in Section 14.2(b). The Motion to enjoin Defendants from violating that provision is DENIED.

---

[3] The court need not address further complications in terms of whether the Agreement extends beyond a time the courts would find reasonable. While the competition restriction at first appears to be for two (2) years, the language of Section 14.3 makes the time period much less clear. That section provides that, "if any person restricted by this Section 14 refuses to voluntarily comply with the foregoing obligations, the two (2) year period will commence with the entry of any order of court or arbitrator enforcing this Section 14." (Agrmt. § 14.3.) Defendants contend that the time cannot be determined under this language, but that in any event, the restriction is well beyond two (2) years and further beyond the bounds of what the North Carolina courts have been willing to enforce. North Carolina courts generally analyze the time and territory restrictions in tandem. *See Farr Assocs., Inc.*, 138 N.C. App. at 280, 530 S.E.2d at 881. When the restraint on competition results from the sale of a business, North Carolina courts have upheld restrictive covenants containing limitations of ten (10), fifteen (15), and twenty (20) years, as well as for the life of one of the parties. *Jewel Box Stores Corp.*, 272 N.C. at 663, 158 S.E.2d at 843 (citations omitted).

{39} OLP is, however, entitled to enjoin violations of other provisions of the Agreement. To prevail on a claim for breach of contract under North Carolina law, a plaintiff must establish the existence of a valid contract and a breach of the contractual terms. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

{40} Harders does not challenge the validity of the Agreement or the post-termination undertakings outlined in Section 17.9, but takes exception to the class of materials asserted by OLP to be proprietary and competitively sensitive. More specifically, by affidavit, Harders asserts:

(a) "The information that OLP claims is 'proprietary' and 'competitively-sensitive' information . . . is publicly available and readily known to competitors of OLP." (Harders Aff. ¶ 30.)

(b) "OLP's purported 'training' and/or 'Business System' regarding the installation of low-voltage outdoor lighting is the same information that is taught by fixture manufacturers, lighting distributors, . . . as well as landscape design courses in schools, trade-shows, hardware and home improvement stores, and on television and the internet." (Harders Aff. ¶ 31.)

(c) "The 'training' provided by the OLP manual was very basic information that . . . is taught free to customers at Lowe's, Home Depot and other home improvement stores throughout the country." (Harders Aff. ¶ 32.)

(d) "The purported proprietary and confidential training regarding the various installation techniques is not taught by OLP or its employees . . . [but] by one of its suppliers, B&B. The training provided to OLP franchisees by B&B is the same training that B&B puts on for free for competitors of OLP . . ." (Harders Aff. ¶ 34.)

{41} During oral argument, Harders stated that he "threw away" most of the competitively sensitive and proprietary information distributed to him by OLP and that he cancelled the OLP-NV telephone number after the Agreement expired.

{42} Section 17.9 of the Agreement gives OLP the option of having the franchisee cancel phone numbers or have them assigned to OLP.

{43} By Harders' own admission, he is in breach of Section 17.9 of the Agreement because he: (1) retained certain OLP proprietary and competitively sensitive information which he deems essential to this litigation and for income tax purposes; (2) retained certain installation files in an effort to provide maintenance to customers serviced by OLP-NV during the term of the Agreement; and (3) failed to assign OLP-NV's telephone number within five (5) days of the Agreement's expiration in accordance with Section 17.9(c).

{44} OLP has demonstrated a likelihood of success on the merits of its claim for breach of the post-expiration undertakings in Section 17.9 of the Agreement.

{45} OLP has demonstrated sufficient irreparable injury to justify injunctive relief. A party may show that it will suffer "irreparable injury" for which it has no adequate remedy at law where damages are difficult and cannot be ascertained with certainty. *See e.g., A.E.P.*, 308 N.C. 393, 406–07, 302 S.E.2d 754, 762 ("[O]ne of the factors used in determining the adequacy of a remedy at law for money damages is the difficulty and uncertainty in determining the amount of damages to be awarded for defendant's breach").

{46} OLP has been harmed. Harders has retained and made use of confidential OLP information including customer and installation files and has used worked performed by OLP-NV to market Enlightened and compete for business in the Northern Virginia territory.

{47} If the court does not enjoin Harders' continued breach of the post-expiration undertakings in Section 17.9 of the Agreement, OLP will suffer irreparable harm to its goodwill and franchise system.

{58} It is difficult, if not impossible, to assign a dollar figure to the damages OLP may suffer in this case. The court cannot quantify the economic loss attendant to OLP's loss of goodwill, customer relationships, and franchise System as a result of Harders' improper use and retention of the competitively sensitive and proprietary information.

{49} Section 17.18 of the Agreement acknowledges the availability of injunctive relief to prevent irreparable harm stating "[n]othing herein shall prevent

the Franchisor or the Franchisee from seeking injunctive relief to prevent irreparable harm, in addition to all other remedies." Similar language has been recognized as evidence of the inadequacy of monetary damages. *A.E.P.*, 308 N. C. at 406, 302 S.E.2d at 762; *see Amdar, Inc. v. Satterwhite*, 37 N.C. App. 410, 246 S.E.2d 165, *disc. rev. den.* 295 N.C. 645 (1978).

{50} Harders, Enlightened, and OLP-NV will suffer materially less damage or injury than OLP if Harders is not enjoined from the continued breach of the post-expiration undertakings in Section 17.9.

{51} Harders contends that he has merely retained certain unidentified documents "solely for the purposes of this lawsuit" and "for income tax purposes." (Harders Aff. ¶ 61.) The court concludes that OLP's interest in preserving the integrity of its competitively sensitive and proprietary information outweighs any harm that might be suffered by Harders, Enlightened, or OLP-NV.

{52} Rule 65(c) requires that the grant of a preliminary injunction shall be conditioned upon the giving of security by the moving party in a sum determined by the court to be proper for the payment of costs and damages that may be suffered by a party ultimately determined to have been wrongfully enjoined or restrained.

{53} In its discretion, the court concludes that to protect the interests of those impacted by this injunction, security in the amount of $5,000 is reasonable and appropriate as a condition of granting a preliminary injunction in this matter.

NOW THEREFORE, based upon the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it is hereby ORDERED that:

{1} The Motion by Plaintiff seeking a preliminary injunction is GRANTED, in part, based on the terms and conditions of this Order.

{2} This Order is intended only to preserve the status quo between OLP and the Defendants during the pendency of this litigation.

{3} Conditioned upon compliance by OLP with the requirement in Paragraph 53 above, Defendants shall:

> (a) immediately discontinue the use, if any, of all signs, structures, forms of advertising, telephone listings, facsimile numbers, e-mail addresses,

the Manual, and all materials, Products and Services of any kind which are identified or associated with the System; and return all of these materials and Products to OLP;

(b) within ten (10) business days turn over to OLP all materials, including the Manual, customer lists, records, files, instructions, brochures, advertising materials, agreements, Confidential Information, Trade Secrets and any and all other materials provided by OLP to Harders and/or OLP-NV or created by a third party for Harders or OLP-NV relating to the operation of OLP-NV. Under no circumstances shall Harders, OLP-NV, or Enlightened retain any printed or electronic copies of the Manual, Confidential Information, or Trade Secrets or portions thereof; and

(c) within ten (10) days take all necessary action to assign to OLP or its designee as determined by OLP, all of the Defendants' right, title, and interest in and to the telephone numbers previously used in the operation of OLP-NV.

{4} Notwithstanding the requirements of Paragraph 3 above, and upon five (5) business days written notice, OLP shall provide Harders access to any and all financial records necessary for the sole and exclusive purpose of facilitating the accurate reporting of Harders' income or other business taxes.

{5} The security required by Paragraph 55 shall be in the form of a surety bond or other undertaking satisfactory to the Clerk of Superior Court of Mecklenburg County, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined by this Order.

{6} Except as GRANTED by the terms of this Order, the Motion is DENIED.


IT IS SO ORDERED, this 14th day of May, 2012.