Islet Scis., Inc. v. Brighthaven Ventures, LLC, 2017 NCBC 17.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 16388

ISLET SCIENCES, INC. )
             Plaintiff, )
)
        v. )
)
BRIGHTHAVEN VENTURES, LLC, )
JAMES GREEN, WILLIAM WILKISON, )
OFSINK LLC, and DARREN OFSINK, )
             Defendants, )
)
and )
)
BRIGHTHAVEN VENTURES LLC, )
             Third-Party Plaintiff, )
)
        v. )
)
JOHN F. STEEL, IV, EDWARD T. )
GIBSTEIN, and COVA CAPITAL )
PARTNERS, LLC, )
             Third-Party Defendants.)

OPINION AND ORDER ON
THIRD-PARTY DEFENDANTS
JOHN STEEL, EDWARD
GIBSTEIN, & COVA CAPITAL
PARTNERS LLC'S MOTION
TO DISMISS

THIS MATTER comes before the Court on Third-Party Defendants John F. Steel, Edward T. Gibstein, and COVA Capital Partners, LLC's (collectively, "Third-Party Defendants") Motion to Dismiss Defendant Brighthaven Ventures LLC's Third-Party Complaint ("Motion to Dismiss").

THE COURT, after considering the Motion to Dismiss, the briefs in support of and in opposition to the Motion to Dismiss, the arguments of counsel at the hearing, and other appropriate matters of record, concludes that the Motion to Dismiss should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

*McGuireWoods LLP by Michael F. Easley, Jr, Esq., Irving M. Brenner, Esq., Michael L. Simes, Esq., for Plaintiff Islet Sciences, Inc. and for*

*Third-Party Defendants John F. Steel, IV, Edward T. Gibstein and COVA Capital Partners, LLC.*

*Parry Tyndall White by K. Allan Parry, Esq., for Defendants James Green and William Wilkison.*

*Jerry Meek, PLLC by Gerald F. Meek, Esq. for Defendant Brighthaven Ventures, LLC.*

*Young Moore and Henderson, P.A. by Walter E. Brock, Jr., Esq. for Defendants Ofsink LLC and Darren Ofsink.*

McGuire, Judge.

## I.    FACTUAL AND PROCEDURAL BACKGROUND.

1.    The factual and procedural background of this matter has been recited by the Court in its Opinion and Order on Green and Wilkison's Motions and its Opinion and Order on Defendant Brighthaven, LLC's Motion to Dismiss issued on January 12, 2017. Here, the Court recites only those background and procedural facts necessary to the resolution of the Motion to Dismiss.[1]

2.    Plaintiff Islet Sciences, Inc. ("Islet" or "Plaintiff") is a public corporation organized and existing under the laws of the State of Nevada with its headquarters in Raleigh, North Carolina. Islet is in the business of developing and commercializing new medicines and technologies to treat patients suffering from metabolic disease. John F. Steel ("Steel") was Islet's largest shareholder and at all times relevant to this matter was on Islet's Board of Directors.

---

[1] The background facts are drawn from the allegations in BHV's Third-Party Complaint (hereinafter "Third-Party Compl.") and BHV's Counterclaims (hereinafter "Countercl."), which are expressly incorporated into the Third-Party Complaint (Third-Party Compl. ¶¶ 5, 10, 15, and 20.)

3. Defendant Brighthaven Ventures, LLC ("BHV") is a privately-owned pharmaceutical research and development company headquartered in Raleigh, North Carolina. BHV develops pharmaceutical products to treat obesity-related health complications. Defendants James Green ("Green") and William Wilkison ("Wilkison") own BHV.

4. At all times relevant to this lawsuit, BHV was developing the SGLT2 inhibitor remoglifozin etzbonate ("Remo") to treat type 2 diabetes and nonalcoholic steatohepatitis under a licensing agreement with Kissei Pharmaceuticals ("Kissei"), the original creator and developer of Remo.

5. COVA Capital Partners, LLC ("COVA"), a New York limited liability company, is an investment banker. Edward T. Gibstein ("Gibstein") is the CEO and owner of COVA.

6. On August 6, 2013, Islet signed an engagement agreement with COVA. Under the agreement, COVA was to provide investment banking services to Islet and raise funds for Islet in exchange for a commission on all amounts raised. On September 10, 2013, BHV entered into a "Mutual Nondisclosure Agreement" with COVA pursuant to which the parties agreed not to use or disclose "Confidential Information" belonging to either party or to any third party for two years. (Mem. Supp. Mot. Dismiss Third-Party Compl., Ex. C – Mutual Nondisclosure Agreement.)

7. By September 2013, discussions began between Islet, COVA, Gibstein, and BHV concerning BHV granting a sublicense to Islet for the development of Remo. BHV contends that "Gibstein, COVA, and Islet knew that BHV was not interested in

entering into a relationship with Islet for the development of Remo, except pursuant to a license agreement," and that Green and Wilkison were not interested in becoming directors or officers of Islet "unless BHV and Islet entered into a license agreement for Remo." (Countercl. ¶ 4.)

8. On October 29, 2013, Gibstein, acting on behalf of COVA and Islet, represented to BHV, through Green and Wilkison, that BHV and Islet had reached an agreement for the license of Remo and that Islet's board of directors supported the agreement. On October 30, 2013, in reliance upon Gibstein's representation, Green and Wilkison accepted their appointments as the CEO and COO, respectively, of Islet and members of Islet's board of directors.

9. BHV also alleges that in reliance on the representation that Islet and BHV had reached agreement on a license for Remo, BHV "changed course with respect to the development of Remo," "deferred pursuit of funding opportunities for the further development of Remo while the agreement with Islet was being finalized," and missed a "window of opportunity . . . to obtain funding for further development of Remo." (Countercl. ¶ 8.)

10. Despite the representation that the parties had an agreement to license Remo, Gibstein, COVA, and Islet "began to repudiate the license of Remo" and "instead promote a merger between Islet and BHV." (Countercl. ¶ 9.) BHV alleges that once Gibstein, COVA, and Islet repudiated the proposed license agreement, it "considered the proposed merger to be its only realistic alternative." (Countercl. ¶ 10.)

11.  On March 12, 2014, BHV entered into a Binding Letter of Intent with Islet pursuant to which Islet would acquire BHV. On September 30, 2014, BHV and Islet entered into an Agreement and Plan of Merger ("Merger Agreement"). Both the Letter of Intent and the Merger Agreement provided that Islet would be responsible for all costs and expenses of the merger transaction. (Countercl. ¶¶ 11–12.)

12.  Steel initially supported the Merger Agreement, believing the proposed merger would increase the value of his Islet stock. Contrary to his expectations, however, following the public announcement of the Merger Agreement, Islet's share price did not increase significantly. (Countercl. ¶¶ 13–14.) Concerned that his ownership in Islet would be diluted, Steel "conspir[ed] with Gibstein, Richard Schoninger, and others, [to launch] a campaign to replace the agreed upon Merger Agreement with a new merger agreement that minimized the risk that his shares would be diluted." (Countercl. ¶ 14.)

13.  Ultimately, a majority of disinterested Islet directors agreed to terminate the Merger Agreement and, instead, enter into an exclusive license agreement for the development of Remo. (Countercl. ¶ 15.) On March 3, 2015, Islet and BHV entered into an agreement terminating the Merger Agreement ("Termination Agreement"). (Countercl. ¶¶ 15–19.) The Termination Agreement again provided that Islet would pay all costs and expenses resulting from the Merger Agreement, the Termination Agreement, and the Exclusive License Agreement. (Countercl. ¶¶ 15–19.)

14. On March 3, 2015, Islet and BHV also entered into an exclusive license agreement for the development of Remo ("Exclusive License Agreement"). The Exclusive License Agreement provided that it would become effective only if Islet raised $10 million in equity or debt financing by May 31, 2015. BHV eventually extended the deadline for raising the $10 million to July 13, 2015.

15. After Steel failed to block termination of the Merger Agreement and approval of the Exclusive License Agreement, "Steel, Gibstein, and others launched a campaign to undermine Islet's attempt to raise the $10 million in capital required to make the Exclusive License Agreement effective." (Countercl. ¶ 25.)

16. In June 2015, Steel and Gibstein learned that Islet was close to raising the financing required to make the Exclusive License Agreement effective. On June 29, 2015, in an attempt to prevent Islet from securing the financing, Steel, Gibstein, and other Islet shareholders aligned with Steel, filed a Petition in state court in Nevada seeking an order requiring Islet to hold a shareholders' meeting "for the purpose of electing directors as required by" Nevada law. ("Nevada Lawsuit"). (Countercl. ¶ 27; Mem. Supp. Mot. Dismiss Third-Party Compl., Ex. A.) On July 7, 2015, the Nevada Court issued a temporary restraining order requiring a meeting of the shareholders and enjoining Islet from taking any actions outside the ordinary course of business. (Countercl. ¶ 27; Mem. Supp. Mot. Dismiss Third-Party Compl., Ex. B.)

17. Steel's and Gibstein's motive in filing the Nevada Lawsuit was to "effectively eliminate Islet's ability to raise the capital required by the Exclusive

License Agreement," by causing the expiration of the Exclusive Licensing Agreement. (Countercl. ¶¶ 28, 31.)

18. Islet failed to raise the $10 million by July 13, 2015, and the Exclusive License Agreement expired. (*Id.* ¶ 30.)

19. On December 11, 2015, Islet initiated this lawsuit by filing a Complaint.

20. On December 14, 2015, this case was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of Chief Judge James L. Gale on December 14, 2015.

21. On February 19, 2016, BHV filed its Answer, Counterclaims, and Third-Party Complaint against Steel, Gibstein, and COVA. In its Third-Party Complaint, BHV asserts the following causes of action: (1) tortious interference with a contract against Steel and Gibstein; (2) tortious interference with prospective advantage, in the alternative, against Steel and Gibstein; (3) breach of contract against COVA; and (4) common law fraud, in the alternative, against COVA and Gibstein.

22. On May 13, 2016, Third-Party Defendants filed the Motion to Dismiss pursuant to Rules 12(b)(2) and (6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). Third-Party Defendants seek dismissal of Steel because the Court lacks personal jurisdiction over him and dismissal of the remaining Third-Party Defendants on the grounds that BHV failed to allege sufficient facts to establish each

of the causes of action. The Motion to Dismiss was fully briefed, the Court has heard arguments, and it is now ripe for disposition.

II.    ANALYSIS.

    A.    *Motion to Dismiss Steel pursuant to Rule 12(b)(2) for lack of personal jurisdiction.*

    23.    BHV makes claims against Steel for tortious interference with contract and, alternatively, tortious interference with prospective advantage. (Third-Party Compl. ¶¶ 5–14.) BHV alleges that "[t]he Exclusive License Agreement constituted a valid contract between BHV and Islet, conferring upon BHV certain contractual rights against Islet," and that "Steel . . . intentionally and maliciously induced Islet not to perform its obligations under the Exclusive License Agreement." (Third-Party Compl. ¶¶ 6, 8.) Alternatively, BHV alleges that if the Exclusive License Agreement did not become a binding contract, it "constituted a prospective advantage for BHV," and that Steel interfered with the prospective advantage. (*Id.* ¶11–12.)

    24.    Third-Party Defendants move to dismiss the claims against Steel on the grounds that Steel is not subject to personal jurisdiction in this state. (Mem. Supp. Mot. Dismiss Third-Party Compl. 4.) Steel is a resident and citizen of California, and BHV does not allege that Steel was present in North Carolina at any time relevant to this matter. Third-Party Defendants contend that Steel does not have sufficient contacts with North Carolina for this Court to exercise jurisdiction over him. Since Steel has not offered an affidavit in support of his motion, however, the allegations in the Third-Party Complaint must be "accepted as true and deemed controlling." *Brown v. Refuel Am., Inc.*, 186 N.C. App. 631, 634, 652 S.E.2d 389, 392 (2007).

25. "[T]he plaintiff bears the burden of proving, by a preponderance of the evidence, grounds for exercising personal jurisdiction over a defendant. . . . [U]pon a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of making out a *prima facie* case that jurisdiction exists." *Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 68, 698 S.E.2d 757, 761 (2010) (citation omitted). To determine whether personal jurisdiction over a defendant exists, the Court conducts a two-step analysis: first, personal jurisdiction must exist under the North Carolina long-arm statute; second, the exercise of personal jurisdiction must not violate the due process clause of the Fourteenth Amendment of the United States Constitution. *Bauer*, 207 N.C. App. at 67, 698 S.E.2d at 760; *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693, 611 S.E.2d 179, 182 (2005). However, because North Carolina's long-arm statute has been interpreted to allow the exercise of personal jurisdiction to the fullest extent allowed under the due process clause, the two-step analysis generally collapses into one inquiry. *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630–31 (1977); *Brown*, 186 N.C. App. at 633, 652 S.E.2d at 391.

26. For a court to exercise personal jurisdiction over a non-resident defendant, due process requires that the defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted). The defendant must purposefully avail himself of the privilege of conducting activities in the forum state,

thereby invoking the benefits and protections of the forum state's laws. *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 365, 348 S.E.2d 782, 786 (1986). The "relationship between the defendant and the forum must be 'such that he should reasonably anticipate being haled into court there.'" *Id.* at 365–66, 348 S.E.2d at 786 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Unilateral activity within the forum state by others who have some relationship with a non-resident defendant is insufficient*. Banc of Am. Sec. LLC*, 169 N.C. App. at 695, 611 S.E.2d at 184. "Each defendant's contacts with the forum State must be assessed individually." *Brown*, 186 N.C. App. at 638, 652 S.E.2d at 394 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

27. In determining whether a defendant has sufficient minimum contacts, North Carolina courts consider "(1) the quantity of the contacts, (2) the nature and quality of the contacts, (3) the source and connection of the cause of action to the contacts, (4) the interest of the forum state, and (5) the convenience to the parties." *Banc of Am. Sec. LLC*, 169 N.C. App. at 696, 611 S.E.2d at 184.

28. There are two types of personal jurisdiction: specific jurisdiction and general jurisdiction. *Id.* Specific jurisdiction exists when a defendant purposefully directed his activities toward the forum and the cause of action arises out of or relates to such activities. *Stetser v. TAP Pharm. Prods. Inc.*, 162 N.C. App. 518, 521, 591 S.E.2d 572, 575 (2004). The essential foundation of specific jurisdiction is the relationship among the defendant, the forum state, and the cause of action. *Tom Togs, Inc.*, 318 N.C. at 366, 348 S.E.2d at 786. The cause of action must arise out of activities

defendant purposefully directed toward the forum state. *Stetser*, 162 N.C. App. at 521, 591 S.E.2d at 575. A defendant can reasonably anticipate that he may be sued in a state for injuries arising from activities that he purposefully directed toward that state. *Tom Togs, Inc.*, 318 N.C. at 366, 348 S.E.2d at 786.

29.     General jurisdiction exists when the defendant maintains continuous and systematic contacts with the forum state, even though those contacts may be unrelated to the cause of action. *Stetser*, 162 N.C. App. at 521, 591 S.E.2d at 575. In assessing whether a non-resident defendant has continuous and systematic contacts so as to support general jurisdiction, a court examines all contacts with the forum that occurred during the relevant time period. *Sea-Roy Corp. v. Parts R Parts, Inc.*, No. 1:94CV00059, 1995 U.S. Dist. LEXIS 21859, at *34–35 (M.D.N.C. Aug. 16, 1995). The level of minimum contacts required to support general jurisdiction is significantly higher than that required to support specific jurisdiction. *Cambridge Homes of N.C. L.P. v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 412, 670 S.E.2d 290, 295 (2008); *Stetser*, 162 N.C. App. at 521, 591 S.E.2d at 575. A determination of whether a defendant has such continuous and systematic contacts so as to support general jurisdiction is based on the totality of the circumstances and depends on the facts of each case. *Stetser*, 162 N.C. App. at 522, 591 S.E.2d at 576.

30.     BHV argues only that the Court has specific personal jurisdiction over Steel, and not general personal jurisdiction.

31.     BHV contends that jurisdiction is conferred over Steel pursuant to G.S. § 1-75.4(3) which provides personal jurisdiction "[i]n any action claiming injury to

person or property . . . within or without this State arising out of an act or omission within this State by the defendant." BHV claims Steel tortiously interfered with the Exclusive License Agreement between Islet and BHV. In the Third-Party Complaint, BHV alleges Steel interfered "with a contract between two companies headquartered in North Carolina, which conduct constitutes an act within this State causing injury to a North Carolina company." (Third-Party Compl. ¶ 4.) "[A] claim of action for tortious interference with contract has also been considered a local act or omission for purposes of personal jurisdiction in North Carolina." *Kehrer v. Fields*, No. 5:11-CV-260-FL, 2012 U.S. Dist. LEXIS 2282, at *8 n. 3 (E.D.N.C. January 9, 2012) (citing *N.C. Mut. Life Ins. Co. v. McKinley Fin. Serv., Inc.*, 386 F. Supp. 2d 648, 655 (M.D.N.C. 2005)). The Court concludes that BHV's allegation that Steel caused BHV injury by interfering with the Exclusive License Agreement is sufficient to invoke the long-arm statute.

32.     The Court also must determine if Steel's contacts in North Carolina are sufficient to assert personal jurisdiction over him in accordance with the federal due process standard. *Replacements, Ltd. v. Midwesterling*, 133 N.C. App. 139, 143, 515 S.E.2d 46, 49 (1999) ("When personal jurisdiction is alleged to exist pursuant to the long-arm statute, the question of statutory authority collapses into one inquiry – whether the defendant has the minimum contacts with North Carolina necessary to meet the requirements of due process.")

33.     Plaintiff points the Court to *Calder*, 465 U.S. 783, 790, and its progeny in support of its argument that Steel has sufficient contacts to satisfy due process.

(Br. Opp. Third-Party Defs.' Mot. Dismiss 8.) The "effects test" (or "*Calder* test") requires the plaintiff to establish the following to support the exercise of specific jurisdiction over an out-of-forum defendant: "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 398 n. 7 (4th Cir. 2003); *see also Walden v. Fiore*, 134 S.Ct. 1115 (2014) (refining the "effects test" in *Calder*). Under *Calder*, courts have exercised specific jurisdiction over defendants accused of tortious interference where the defendants knew that the harm would be suffered in the forum. *See, e.g., CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1111–12 (9th Cir. 2004) (specific jurisdiction over tortious interference claim exists where defendant committed intentional acts outside of the forum with knowledge that the harm would be suffered in the forum); *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 384 (5th Cir. 2003) (defendant's awareness of and interference with a contractual relationship between two Texas-based companies whose business relationship centers around Texas and that resulted in harm to plaintiff in Texas supported personal jurisdiction in Texas); *Remick v. Manfredy*, 238 F.3d 248, 260 (3rd Cir. 2001) (specific jurisdiction exists over tortious interference claim where the effects of the defendants' intentional conduct would necessarily have been felt in forum).

34.     Third-Party Defendants argue that the required minimum contacts must arise from the defendant's own actions that are connected to the forum, such that the plaintiff is not the only link between the defendant and the forum. (Mem. Supp. Mot. Dismiss Third-Party Compl. 5, citing *Walden*, 134 S. Ct. at 1122.) In *Walden*, the Court held:

> *Calder* [*v. Jones*, 465 U.S. 783 (1984)] made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

134 S.Ct. at 1125.

35.     Here, however, the fact that BHV was injured in North Carolina is not the only link between Steel and this State. Islet, also headquartered in Raleigh, is the other party to the Exclusive Licensing Agreement with which Steel allegedly interfered. In filing the lawsuit in Nevada state court, Steel sought and obtained an order requiring a meeting of the shareholders that he would have known would be communicated to Islet's officials at the corporation's Raleigh offices, and would require those same officials to take actions in Raleigh to facilitate the holding of the shareholders meeting. The Court concludes that the nature and quality of Steel's contacts, the connection between those contacts and BHV's claims for tortious interference, and North Carolina's interest in the Exclusive License Agreement, are sufficient to satisfy due process requirements.

36.     Accordingly, Third-Party Defendants' motion to dismiss Steel for lack of personal jurisdiction pursuant to Rule 12(b)(2) is DENIED.

B.     *Motion to Dismiss Pursuant to Rule 12(b)(6).*

37.     Third-Party Defendants move to dismiss each of the claims against them pursuant to Rule 12(b)(6) on the grounds that BHV has failed to state claims on which relief can be granted.  In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations of the complaint in the light most favorable to the plaintiff. The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

38.     Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

39.     The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). A "trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862. The Court can also ignore a party's legal conclusions set forth in its pleading. *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

### 1. Tortious Interference with a Contract against Steel and Gibstein.

40.     BHV makes claims for tortious interference with contract against Steel and Gibstein, alleging that they "intentionally and maliciously induced Islet not to perform its obligations under the Exclusive License Agreement by, in part, taking actions designed to sabotage Islet's ability to perform under that agreement." (Third-Party Compl. ¶ 8.) BHV alleges that Steel and Gibstein interfered with the Exclusive License Agreement by filing the Nevada Lawsuit and obtaining the temporary restraining order in that lawsuit. (Countercl. ¶ 27.) Although BHV contends that Steel and Gibstein interfered with the Exclusive License Agreement by other conduct in addition to filing the Nevada Lawsuit (Br. Opp. Third-Party Defs.' Mot. Dismiss 10), it has not alleged any other specific conduct in support of the claim for tortious interference with contract.

41.     To establish a claim for tortious interference with contract, a plaintiff must show: "(1) a valid contract between the plaintiff and a third person which confers

upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract, (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *United Lab., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

42.    The Third-Party Defendants argue that BHV has not stated a cause of action for tortious interference with a contract because Steel and Gibstein had a legal right to initiate the Nevada Lawsuit, and the exercise of such right was justified or privileged. (Mem. Supp. Mot. Dismiss Third-Party Compl. 7–10.) A motion to dismiss a claim of tortious interference is properly granted where the complaint shows the interference was justified or privileged. *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 220, 367 S.E.2d 647, 650 (1988). Accordingly, "the complaint must admit of no motive for interference other than malice." *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007).

43.    In support of their argument that Steel and Gibstein were privileged in filing the Nevada Lawsuit, Third-Party Defendants site to several decisions from courts in jurisdictions other than North Carolina. The North Carolina Court of Appeals, however, has held, in at least two instances, that a claim for tortious interference can be based on the filing of a lawsuit and pursuit of legal remedies where such conduct was undertaken for a malicious purpose. *See Pinewood Homes, Inc.*, 184 N.C. App. at 605, 646 S.E.2d at 833 (allowing tortious interference claim where plaintiffs alleged facts supporting allegation "the seeking of the injunction was

the malicious act"); *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 149–50, 555 S.E.2d 281, 289 (2001) (holding that plaintiff is justified in bringing a lawsuit only if he "acted with sufficient lawful reason" and "a showing of legal malice will defeat plaintiff's defense of justification in filing suit" regardless of its "objective reasonableness").

44.     BHV has alleged that Steel and Gibstein acted maliciously in filing the Nevada action, but the Court still must determine whether BHV has alleged facts to support the allegation of malice. *Pinewood Homes*, 184 N.C. App. at 605, 646 S.E.2d at 833 ("[G]eneral allegations of malice are insufficient as a matter of pleading . . . . The court "must determine whether plaintiffs' have alleged a factual basis to support the claim of malice.") (citation omitted).

45.     The Court concludes that BHV has alleged sufficient facts to support its claim that Steel and Gibstein acted with malice. Steel and Gibstein filed the Nevada Lawsuit to petition for an order requiring Islet to hold a shareholders meeting to elect directors. In his tenure as Chairman, CEO, and President of Islet, however, Steel had never convened a meeting of Islet's stockholders. (Countercl. ¶ 27.) BHV alleges that on July 17, 2015, Steel and Gibstein filed a pleading in the Nevada Lawsuit "admitting that their primary motivation in seeking injunctive relief from the Court was to prevent Islet from raising the funds necessary for the license agreement to become effective." (Countercl. ¶ 31.) BHV further alleges "[t]his motive was contrary to the interests of Islet, as reflected in the decision by the majority of Islet's disinterested directors to approve the Exclusive License Agreement" and that Steel

and Gibstein "hoped that, by forcing the termination of the Exclusive License Agreement, they could coerce BHV to enter into a new merger agreement on terms that did not require the issuance of new shares to BHV." (Countercl. ¶ 28.)

46.     Finally, just prior to the scheduled meeting of Islet's shareholders, "COVA filed an action in the United States District Court for the Southern District of New York to block the very shareholder meeting that … Gibstein had petitioned the Nevada Court to order." (Countercl. ¶ 32.) If proven, these factual allegations would tend to support BHV's allegation of malice. *DDM&S Holdings, LLC v. Doc Watson Enters.*, LLC, 2016 NCBC LEXIS 88, *14-15, (N.C. Super. Ct. November 10, 2016) (concluding that plaintiffs alleged facts supporting claim that defendants filed lawsuit for malicious purpose and denying motion to dismiss tortious interference claim where).

47.     Accordingly, Third-Party Defendants' motion to dismiss BHV's claim for tortious interference with a contract should be DENIED.

### 2. Tortious Interference with Prospective Advantage against Steel and Gibstein.

48.     As an alternative claim to its claim for tortious interference with contract, BHV makes a claim for tortious interference with prospective advantage. BHV alleges that "to the extent that the Exclusive License Agreement . . . is not yet an enforceable contract [it] constituted a prospective advantage for BHV" and "Steel and Gibstein intentionally and maliciously induced Islet to refrain from meeting the conditions that would give rise to an effective Exclusive License Agreement. . . ." (Third-Party Compl. ¶¶ 11–12.)

49.    "To state a claim for wrongful interference with prospective advantage, [plaintiff] must allege facts to show that the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000) (citation omitted). As discussed above, BHV has sufficiently alleged that Steel and Gibstein acted with malice, and without justification, in interfering with the Exclusive License Agreement.

50.    Third-Party Defendants' motion to dismiss BHV's claim for tortious interference with prospective advantage should be DENIED.

### 3. Breach of Contract against COVA.

51.    BHV alleges "BHV and COVA entered into the Mutual Nondisclosure Agreement, pursuant to which COVA agreed not to disclose any 'Confidential Information' of BHV to any third-party for two years after receiving such information." (Third-Party Compl. ¶ 16.) BHV further alleges that it complied with the terms of the agreement, but that "COVA breached the Mutual Nondisclosure Agreement by and through the public disclosures made by COVA" in the two lawsuits filed in New York and "upon information and belief, by other disclosures." (*Id.* ¶¶ 17–18.) Finally, BHV alleges that as a result of COVA's breach, BHV suffered damages. (*Id.* ¶ 19.)

52.    Third-Party Defendants argue that BHV has not alleged the specific confidential information that was disclosed, and that the facts disclosed in the New York lawsuits were public, and not confidential, information. (Mem. Supp. Mot.

Dismiss Third-Party Compl. 10–12.) In the Third-Party Complaint, BHV does not specify the confidential information allegedly disclosed in the New York lawsuits, but contends in its brief that "both lawsuits revealed specific details regarding the milestone payments contemplated in the proposed merger between Islet and BHV," and that such information was confidential. (Br. Opp. Third-Party Defs.' Mot. Dismiss 16.)

53. As a preliminary matter, the Mutual Nondisclosure Agreement contains a choice of laws provision stating that New York law governs the agreement. Under New York law, "[t]he essential elements for pleading a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Dee v. Rakower*, 112 A.D.3d 204, 208–09, 976 N.Y.S.2d 470, 474 (2013).

54. The question of whether BHV has sufficiently pleaded its claim for breach of contract, however, is a procedural matter to which North Carolina's pleading requirements apply. *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988) (holding that under North Carolina conflict of law principles, matters affecting the substantial rights of the parties are determined by *lex loci*, the law of the situs of the claim, and remedial or procedural rights are determined by *lex fori*, the law of the forum); *accord Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722–23 (2010); *Camacho v. McCallum*, 2016 NCBC LEXIS 81, at *16–17 (N.C. Super. Ct. October 25, 2016). Rule 8 of the North

Carolina Rules of Civil Procedure requires only that a claimant provide "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief." G.S. § 1A-1, Rule 8(a)(1). In addition, our Court of Appeals recently has reiterated that "[t]he general standard for civil pleadings in North Carolina is notice pleading. Pleadings should be construed liberally and are sufficient if they give notice of the events and transactions and allow the adverse party to understand the nature of the claim and to prepare for trial." *Radcliffe v. Avenel Homeowners Ass'n*, 2016 N.C. App. LEXIS 824, at *52, 789 S.E.2d 893, 913 (N.C. Ct. App. Aug. 2, 2016).

55. BHV has met North Carolina's notice pleading standard by adequately alleging each of the elements of a claim for breach of contract under New York law. Third-Party Defendants' motion to dismiss BHV's claim for breach of contract should be DENIED.

### 4. Common Law Fraud against COVA and Gibstein.

56. BHV purports to bring a claim, in the alternative, for fraud against COVA and Gibstein in the event the "Court determine[s] that no agreement was reached between Islet and BHV for the license of Remo." (Third-Party Compl. ¶ 24.) BHV alleges that on October 29, 2013, Gibstein, acting as an agent of COVA, sent an email to Green in which Gibstein "represented that 'the financial terms for all BHV technology to be licensed to Islet Sciences have been agreed upon." (Third-Party Compl. ¶ 21, 22.) BHV further alleges that "the statement by Gibstein constituted a

false statement as to a material fact which was reasonably calculated to deceive, and did in fact deceive, BHV." (Third-Party Compl. ¶24.)

57. "To make out an actionable case of fraud, plaintiff must show: (a) that the defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that when he made it defendant knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (d) that the defendant made the false representation with the intention that it should be acted on by the plaintiff; (e) that the plaintiff reasonably relied upon the representation and acted upon it; and (f) that the plaintiff suffered injury." *Libby Hill Seafood Rests., Inc. v. Owens*, 62 N.C. App. 695, 698, 303 S.E.2d 565, 568 (1983) (quoting *Odom v. Little Rock & I-85 Corp.*, 299 N.C. 86, 91–92, 261 S.E.2d 99, 103 (1980)). It is well established, however, that

> It . . . is the law in this State, that mere unfulfilled promises cannot be made the basis for an action of fraud. If, however, a promise is made fraudulently--that is, with no intention to carry it out, thus being a misrepresentation of a material fact, the state of the promisor's mind, and with intention that it shall be acted upon, and it is acted upon to the promisee's injury--then, it will sustain an action based on fraud and misrepresentation . . . . Mere proof of nonperformance is not sufficient to establish the necessary fraudulent intent.

*Williams v. Williams*, 220 N.C. 806, 810–11, 18 S.E.2d 364, 366–67 (1942) (citations omitted); *accord Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 229, 768 S.E.2d 582, 598 (2015) ("An unfulfilled promise is not actionable fraud, however, unless the promisor had no intention of carrying it out at the time of the promise, since this is misrepresentation of a material fact.").

58.     Preliminarily, the Court must determine the nature of the alleged fraudulent representation because BHV characterizes the representation made by COVA and Gibstein differently in different places in its pleadings. In the claim for fraud in the Third-Party Complaint, BHV alleges that Gibstein "represented that 'the financial terms for all BHV technology to be licensed to Islet Sciences have been agreed upon.'" (Third-Party Compl. ¶ 21; emphasis added.) In its allegation in the Counterclaim, which BHV expressly incorporates into the fraud claim (Third-Party Compl. ¶ 20), BHV alleges Gibstein represented that "BHV and Islet had reached agreement for the license of Remo to Islet." (Countercl. ¶ 6; emphasis added.) In its Counterclaim allegations, BHV also alleges that the parties had only "reached agreement as to all material terms" of the license agreement, but that further negotiations were necessary to "consummate the agreed upon transaction" (Countercl. ¶¶ 71–72.) Consistent with the notion that material terms had been agreed upon but that the parties had not entered into a final agreement are BHV's allegations characterizing the license for the development of Remo as "the anticipated license agreement," the "proposed license agreement," and the "potential license." (Countercl. ¶¶ 9–10.) Finally, BHV also alleges that it was only after Green and Wilkison accepted positions with Islet on October 30, 2013, that Islet "began to repudiate the agreed license," and that it was not until January 2014, Islet, COVA, and Gibstein "abandoned the proposed license agreement, instead pushing BHV to agree to a merger between" Islet and BHV. (Countercl. ¶ 9.)

59.     The Court concludes that BHV's allegations support a claim that Gibstein represented to BHV not that Islet agreed to the final terms of a license agreement, but only that Islet intended to enter into a final license agreement with BHV.

60.     Significantly, however, BHV has not alleged facts that would support a claim that COVA and Gibstein knew that any representation was false when they made it. While BHV alleges that Gibstein and COVA intended to induce BHV and Green and Wilkison into believing that Islet would enter into a final agreement to license the development of Remo, it does not allege that Islet had no intention of reaching a final licensing agreement, nor that COVA and Gibstein knew Islet would not enter a final agreement. Rather, the allegations suggest that COVA and Gibstein believed that Islet would enter into a final license agreement at the time they made the representations, and that it was only later, during negotiations over "non-material" terms, that Islet changed course and decided that it did not want to finalize the agreement.

61.     BHV's failure to allege that COVA and Gibstein knew the representation made on October 29, 2013 was false is fatal to the claim for fraud. *Gadsden v. Johnson*, 261 N.C. 743, 748, 136 S.E.2d 74, 78 (1964) (holding that the plaintiff did not allege the essential elements of promissory fraud where the complaint "[did] not allege that . . . promissory representations were made by defendants with no intention of carrying them out"); *Braun v. Glade Valley Sch., Inc.*, 77 N.C. App. 83, 87–88, 334 S.E.2d 404, 407 (1985) (affirming dismissal of claim for

fraud where "the plaintiff made no allegations as to the defendant's intent to deceive the plaintiff. . . . [and] [t]here are no allegations in the complaint that the defendants knew the representation was false or made the representation recklessly and without regard for its truth"). Accordingly, Third-Party Defendants' motion to dismiss BHV's claim for fraud should be GRANTED.

THEREFORE, IT IS ORDERED that:

62. Third-Party Defendants' Motion to Dismiss all claims against Steel for want of personal jurisdiction is DENIED.

63. Third-Party Defendants' Motion to Dismiss BHV's Third-Party claim for tortious interference with a contract against Steel and Gibstein is DENIED.

64. Third-Party Defendants' Motion to Dismiss BHV's Third-Party claim for tortious interference with prospective advantage against Steel and Gibstein is DENIED.

65. Third-Party Defendants' Motion to Dismiss BHV's Third-Party claim for breach of contract against COVA is DENIED.

66. Third-Party Defendants' Motion to Dismiss BHV's Third-Party claim for common law fraud against COVA and Gibstein is GRANTED.

67. Except as expressly granted above, Third-Party Defendants' Motion to Dismiss is DENIED.

This the 6th day of March, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
  for Complex Business Cases